# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES COPLEY, JASON EVANS, HUMBERTO GARCIA, LUZ ANGELINA GARCIA, JOAN MCDONALD, JOHN PETERSON, BETTY PRESSLEY, NATALIE ROBERTS, NORMAN SKARE, individually and as personal representative for BETTY SKARE, DAVID STONE, and KAYE WINK, individually and as next of kin of DONALD WINK, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br>v.<br><br>BACTOLAC PHARMACEUTICAL, INC.; NATURMED, INC. d/b/a INSTITUTE FOR VIBRANT LIVING; and INDEPENDENT VITAL LIFE, LLC,<br><br>       Defendants. | No.:  2:18-cv-00575-FB-PK<br><br>*Consolidated with*<br><br>No. 2:20-cv-01338-FB-PK |
| JEFFREY FARIS, ANTONIA HAMPTON, RAUL ROBLES, and KATHLEEN CANNON, Individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br>v.<br><br>BACTOLAC PHARMACEUTICAL, INC.; NATURMED, INC. d/b/a INSTITUTE FOR VIBRANT LIVING; and INDEPENDENT VITAL LIFE, LLC,<br><br>       Defendants. | |

## <ins>PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION</ins>

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I.     FACTUAL BACKGROUND ...........................................................................................3

     A.  The Relationship Between NaturMed and Bactolac. ....................................................3

     B.  ADEG Product Claims...............................................................................................6

     C.  ADEG Causes Significant Customer Illness Beginning in Fall 2014...........................7

     D.  NaturMed Performs DNA Testing in 2016 and Learns of Product Adulteration. .......12

     E.  Plaintiffs' DNA Analysis Confirms the Testing Conducted in *Mooneyham*...............14

     F.  ADEG Misrepresentations and Omissions in Light of DNA Testing Evidence..........15

     G.  Independent Vital Life Obtains NaturMed's Assets. ..................................................16

     H.  Plaintiffs' Purchase and Use of ADEG........................................................................17

     I.  Plaintiffs' Evidence Demonstrates Classwide Damages Are Available Through
        Common Proof..............................................................................................................18

II.    THE PROPOSED CLASSES .........................................................................................19

III.   PROCEDURAL HISTORY ...........................................................................................20

IV.   ARGUMENT .................................................................................................................21

     A.  Legal Standard Applicable to Plaintiffs' Motion........................................................21

     B.  The Court Should Certify the Proposed Nationwide Classes and Statewide
        Classes Pursuing Remedies Under State Consumer Protection Statutes. ...................23

        1.  The Consumer Protection Classes Satisfy Rule 23(a). .........................................23

            a.  The Numerosity Requirement is Satified........................................................23

            b.  The Commonality Requirement is Satisfied....................................................24

            c.  The Typicality Requirement is Satisfied..........................................................30

            d.  The Adequacy Requirement is Satisfied...........................................................31

       e.   The Proposed Classes Are Ascertainable. ........................................................32

   2.   The Consumer Protection Act Classes Satisfy Rule 23(b)(3)...............................32

       a.   The Proposed Consumer Protection Act Classes Satisfy the Predominance
            Requirement. ..................................................................................................33

            i.   Common Issues of Fact and Law Predominate for the Nationwide
                GBL § 349 Class. ......................................................................................34

            ii.   Common Issues of Fact and Law Predominate for the Nationwide
                Arizona CFA Class. ..................................................................................38

            iii.  Common Issues of Fact and Law Predominate for the Statewide
                Consumer Protection Act Classes. ............................................................39

       b.   The Proposed Consumer Protection Act Classes Satisfy the Superiority
            Requirement. ..................................................................................................42

C.  The Court Should Certify the Proposed Statewide Classes Alleging Fraudulent
     Concealment Under State Common Law. ....................................................................44

D.  The Court Should Certify the Statewide Unjust Enrichment Classes.........................46

CONCLUSION.....................................................................................................................49

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ........................42

*Allen v. Hyland's Inc.*,
    300 F.R.D. 643 (C.D. Cal. 2014) .......................................................................................37

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................................33, 34, 42, 43

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ...............................................................................................21, 22, 42

*In re Amla Litig.*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) ........................................................................ passim

*In re Arizona Theranos, Inc. Litig.*,
    256 F. Supp. 3d 1009 (D. Ariz. 2017) ..........................................................................27, 38

*Astiana v. Hain Celestial Grp., Inc.*,
    783 F.3d 753 (9th Cir. 2015) .............................................................................................47

*In re Auto Parts Antitrust Litig. (Occupational Safety Sys.)*,
    50 F. Supp. 3d 869 (E.D. Mich. 2014) ..............................................................................48

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
    448 F.3d 573 (2d Cir. 2006) ..............................................................................................47

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...........................................................................................28

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010) ..............................................................................................30

*Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*,
    729 F.3d 108 (2d Cir. 2013) ..................................................................................33, 34, 45

*Cheatham v. ADT Corp.*,
    161 F. Supp. 3d 815 (D. Ariz. 2016) ............................................................................27, 39

*Comcast Corp. v. Behrend*,

569 U.S. 27 (2013) ...................................................................................................22, 36

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ...........................................................28, 40

*Connick v. Suzuki Motor Co., Ltd.*,
    675 N.E.2d 584 (Ill. 1996) ................................................................................27

*Consol. Rail Corp. v. Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) ................................................................................23

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) ..............................................................................36

*Daisy Outdoor Advertising Co., Inc. v. Abbott*,
    473 S.E.2d 47 (S.C. 1996) .................................................................................41

*D'Alauro v. GC Servs. Ltd. P'ship*,
    168 F.R.D. 451 (E.D.N.Y. 1996) ......................................................................42

*Deer Consumer Prods., Inc. v. Little Grp.*,
    37 Misc.3d 1227(A), 2012 WL 5898052 (Sup. Ct. N.Y. Cnty. Nov. 15, 2012)...............26, 35

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)..............................................................................31

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) ........................................................................49

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) .........................................................35, 40, 45

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018)...............................................................28

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
    326 F.R.D. 592 (N.D. Cal. 2018) ......................................................................40

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)...........................................................................................24

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*,
    348 S.W.3d 729 (Ky. 2011) ........................................................................44, 45

*Glatt v. Fox Searchlight Pictures*,
    293 F.R.D. 516 (S.D.N.Y. 2013) ......................................................................30

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    774 N.E.2d 1190 (N.Y. 2002)...................................................................36

*Guerin v. Fulkerson*,
    354 S.W.3d 161 (Ky. Ct. App. 2011) .......................................................47

*Hanks v. Lincoln Life & Annuity Co. of N.Y.*,
    330 F.R.D. 374 (S.D.N.Y. 2019) ...............................................................36

*Hart v. BHH, LLC*,
    No. 15-cv-4804, 2017 WL 2912519 (S.D.N.Y. July 7, 2017).................46

*Harte v. Ocwen Fin. Grp.*,
    No. 13-CV-5410, 2018 WL 1830811 (E.D.N.Y. Feb. 18, 2018) ...........26

*Hartford Casualty Ins. Co. v. J.R. Mktg., LLC*,
    353 P.3d 319 (Cal. 2015)............................................................................48

*Hasemann v. Gerber Prods. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) ..................................................... passim

*Hill v. City of New York*,
    136 F. Supp. 3d 304 (E.D.N.Y. 2015) .....................................................30

*In re Hyundai & Kia Fuel Economy Litig.*,
    926 F.3d 539 (9th Cir. 2019) .......................................................33, 34, 42

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*,
    170 P.3d 10 (Wash. 2007)..........................................................................28

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
    841 S.E.2d 642 (Va. 2020).................................................................47, 48

*James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms, Inc.*,
    275 F.R.D. 638 (M.D. Fla. 2011) .............................................................47

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) ..............................................................49

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015).......................................................................22

*Karlin v. IVF Am.*,
    712 N.E.2d 662 (N.Y. 1999)...............................................................26, 35

*Kenneke v. First Nat'l Bank of Chicago*,
  382 N.E.2d 309 (Ill. App. Ct. 1978) .................................................47

*Koch v. Acker, Merrall & Condit Co.*,
  967 N.E.2d 675 (N.Y. 2012).................................................................26

*Korolshteyn v. Costco Wholesale Corp.*,
  No. 3:15-cv-709-CAB-RBB, 2017 WL 1020391 (N.D. Cal. Mar. 16, 2017) ........41

*Kumar v. Salov N. Am. Corp.*,
  No. 14-CV-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016).................27

*Kurtz v. Costco Wholesale Corp.*,
  768 F. App'x 39 (2d Cir. 2019) ...........................................................24

*Kurtz v. Kimberly-Clark Corp.*,
  321 F.R.D. 482 (E.D.N.Y. 2017) .................................................. passim

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) .....................................................................27

*Lovejoy v. AT&T Corp.*,
  14 Cal. Rptr. 3d 117 (Cal. Ct. App. 2004) ........................................44

*Lynch v. Deaconess Med. Ctr.*,
  776 P.2d 681 (Wash. 1989)..................................................................47

*Madsen v. W. Am. Mortgage Co.*,
  694 P.2d 1228 (Ariz. Ct. App. 1985).................................................27

*Mandarin Trading Ltd. v. Wildenstein*,
  944 N.E.2d 1104 (N.Y. 2011)..............................................................48

*Martin v. JTH Tax, Inc.*,
  2013 WL 1282224 (D.S.C. Mar. 27, 2013) ........................................47

*In re McCormick & Co., Inc. Pepper Prods. & Sales Practices Litig.*,
  422 F. Supp. 3d 194 (D.D.C. 2019)....................................................28

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*,
  471 F.3d 24 (2d Cir. 2006)...................................................................22

*Mooneyham v. NaturMed, Inc. et al.*,
  No. 3:17-cv-00162 (E.D. Ala.) ...........................................................12

*Moore v. PaineWebber, Inc.*,

306 F.3d 1247 (2d Cir. 2002).......................................................................29, 45

*Muehlbauer v. Gen. Motors Corp.*,
    431 F. Supp. 2d 847 (N.D. Ill. 2006) ............................................................48

*Munoz v. MacMillian*,
    195 Cal. App. 4th 648 (Cal. 2011)...............................................................47

*Murphy v. Stonewall Kitchen, LLC*,
    503 S.W.3d 308 (Mo. Ct. App. 2016)...........................................................28

*In re Nassau Cnty. Stip Search Cases*,
    461 F.3d 219 (2d Cir. 2006)....................................................................23, 33

*Nat'l Sur. Corp. v. Immunex Corp.*,
    256 P.3d 439 (Wash. 2011)............................................................................49

*Novell v. Migliaccio*,
    309 N.W.2d 132 (Wis. 2008).........................................................................28

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
    647 N.E.2d 741 (N.Y. 1995)....................................................................26, 35

*Owens v. DRS Automotive Fantomworks, Inc.*,
    764 S.E.2d 256 (Va. 2014)............................................................................29

*In re Packaged Seafood Prods. Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017).........................................................48

*Pearson v. Philip Morris, Inc.*,
    306 P.3d 665 (Ore. 2013)...............................................................................41

*In re Petrobas Sec.*,
    862 F.3d 250 (2d Cir. 2017)..........................................................32, 33, 41, 42

*Plavin v. Grp. Health Inc.*,
    146 N.E.3d 1164 (N.Y. 2020)...........................................................26, 34, 35

*Plubell v. Merck & Co.*,
    289 S.W.3d 707 (Mo. Ct. App. 2009)...........................................................41

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
    842 So.2d 773 (Fla. 2003).............................................................................27

*Puttkammer v. Minth*,
    266 N.W.2d 361 (Wis. 1978)...................................................................47, 48

*Renaissance Academy for Math v. Imagine Schools, Inc.*,
  No. 4:13-CV-00645-NKL, 2014 WL 12606148 (W.D. Mo. Feb. 10, 2014)....................47, 48

*Rikos v. Proctor & Gamble Co.*,
  799 F.3d 497 (6th Cir. 2015) .............................................................40

*R.J. Reynolds Tobacco Co. v. Martin*,
  53 So.3d 1060 (Fla. Dist. Ct. App. 2010) ...............................................44

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)....................................................23, 33, 37

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)...............................................................23

*Rodriguez v. It's Just Lunch, Int'l*,
  300 F.R.D. 125 (S.D.N.Y. 2014) ........................................................49

*Rodriguez v. It's Just Lunch Int'l*,
  No. 07-cv-9227 (SHS), 2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018)............................37, 38

*Rollins, Inc. v. Heller*,
  454 So.2d 580 (Fla. Dist. Ct. App. 1984) ..............................................41

*Romano v. Motorola, Inc.*,
  No. 07-CIV-60517, 2007 WL 4199781 (S.D. Fla. Nov. 26, 2007) ........................................48

*Rosenblum v. First State Bank of Elgin*,
  581 P.2d 515 (Ore. 1978)....................................................................48

*Schwatka v. Super Millwork, Inc.*,
  106 A.D.3d 897 (N.Y. App. Div. 2013) .................................................45

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) ................................................... passim

*Seijas v. Rep. of Argentina*,
  606 F.3d 53 (2d Cir. 2010)................................................................43

*Simpson v. Champion Petfoods USA, Inc.*,
  397 F. Supp. 3d 952 (E.D. Ky. 2019) ...................................................49

*Spradling v. Williams*,
  566 S.W.2d 561 (Tex. 1978).................................................................28

*Stapley v. Am. Bathtub Liners, Inc.*,
    785 P.2d 84 (Ariz. Ct. App. 1989) .......................................................47

*Stinson v. City of New York*,
    282 F.R.D. 360 (S.D.N.Y. 2012) .........................................................22

*Stutman v. Chem. Bank*,
    731 N.E.2d 608 (N.Y. 2000)................................................................26

*Suchanek v. Sturm Foods, Inc.*,
    No. 11-CV-565-NJR-RJD, 2017 WL 3704206 (S.D. Ill. Aug. 28, 2017) ..............................41

*Sykes v. Mel S. Harris & Assocs., LLC*,
    780 F.3d 70 (2d Cir. 2015)...............................................22, 24, 35, 40

*Tavilla v. Cephalon, Inc.*,
    870 F. Supp. 2d 759 (D. Ariz. 2012) ...................................................38

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)................................................................22

*Vu v. Diversified Collection Servs., Inc.*,
    293 F.R.D. 343 (E.D.N.Y. 2013) ........................................................30

*Waldman v. New Chapter, Inc.*,
    714 F. Supp. 2d 398 (E.D.N.Y. 2010) ................................................48

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................24

*Ward v. TheLadders.com, Inc.*,
    3 F. Supp. 3d 151 (S.D.N.Y. 2014) ....................................................36

*Weaver v. Champion Petfoods USA Inc.*,
    No. 18-CV-1996-JPS, 2019 WL 2774139 (E.D. Wis. July 1, 2019)..............................45

*Weidner v. Karlin*,
    932 N.E.2d 602 (Ill. App. Ct. 2010) ...................................................44

*Winters v. Cnty. of Clastop*,
    150 P.3d 1104 (Ore. Ct. App. 2007) ...................................................47

**Statutes**

Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A) ............................................. passim

Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1528 ........................................................39

Fed. R. Civ. P. 23(a) ..............................................................................................22, 46, 47

Fed. R. Civ. P. 23(a)(1) ..................................................................................................23

Fed. R. Civ. P. 23(a)(2) ..............................................................................................24, 44

Fed. R. Civ. P. 23(a)(3) ..................................................................................................30

Fed. R. Civ. P. 23(a)(4) ..................................................................................................31

Fed. R. Civ. P. 23(b)(3) ............................................................................................ passim

Fed. R. Civ. P. 23(g) ......................................................................................................32

Magnuson Moss Warranty Act ..........................................................................................19

N.Y. Gen. Bus. Law § 349 .......................................................................................... passim

N.Y. Gen. Bus. Law § 349(h) ...........................................................................................37

Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*....................................29, 40

Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200 ...................................................29

**Other Authorities**

"Super Greens: Are Greens Powders Healthy?,"
      Marsha McCulloch, Nov. 26, 2018
            Healthline.com/nutrition/super-greens..................................................................5

**INTRODUCTION**

This is a case about the flagrant attempt to defraud tens of thousands of consumers who sought to improve their health by consuming a dietary supplement called All Day Energy Greens ("ADEG"). That supplement was formulated collaboratively by Defendants NaturMed, Inc. ("NaturMed") and Bactolac Pharmaceutical, Inc. ("Bactolac"), and for years it was NaturMed's best-selling product. ADEG came in two blends: an original and Fruity flavor. Both blends promised consumers that the supplement consisted of 38 specific fruits and vegetables mixed into a powder form for consumption as a once-per-day health drink. The product label claimed that one scoop exceeded the equivalent of five servings of fruits and vegetables. ADEG promised to naturally increase energy, improve digestion, provide clear vision, enhance memory, reduce joint pain, cure Crohn's disease, and treat diabetes. Consumers over sixty years of age were the product's largest market.

From the time the product was formulated until July 2015, Bactolac was the sole manufacturer of ADEG. Pursuant to a contract with NaturMed, Bactolac was responsible for procuring the raw materials required by the formula, blending them together into a powder, packaging the powder into canisters, and sending the sealed canisters back to NaturMed for sale to customers nationwide. Each time Bactolac provided NaturMed with a shipment of ADEG, it certified in writing that it had used only those ingredients set forth in the product formula and only in the quantities called for by that formula. Furthermore, because it collaborated with NaturMed to formulate the product and affixed labels to each canister before shipment, Bactolac was well aware of the product claims and the 38 specific fruits and vegetables purported to be present in each canister of ADEG.

In the fall of 2014, Bactolac began deviating from the product formula, using ingredients other than those called for by the formula and omitting certain ingredients altogether. This led to exactly the negative outcomes one would expect. Customers, some of whom were long-time ADEG users, began flooding NaturMed with complaints that the product was causing serious gastrointestinal distress, vomiting, and bloody diarrhea. So many complaints came in that NaturMed had to hire additional employees to staff its call center. NaturMed commenced a months-long investigation and, almost immediately, suspected Bactolac of adulterating the product. Despite these suspicions, NaturMed continued selling ADEG, its best-selling product, and never once warned its customers that the product may cause them harm or that it may not contain fruits and vegetables it purported to contain.

In July 2015, after fielding hundreds of customer complaints for months, NaturMed terminated its relationship with Bactolac and hired another company to manufacture ADEG. Almost immediately, the customer complaints dropped precipitously. Shortly thereafter, NaturMed recalled 99 lots of ADEG manufactured by Bactolac between July 2014 and June 2015. NaturMed would later learn, by performing DNA analysis on samples of the recalled product, that the ADEG manufactured by Bactolac contained ingredients that did not belong and also did not contain ingredients required by the product formula and identified on the product label. Some of the added ingredients were allergens, others contained gluten, still others were weeds not meant for human consumption. Meanwhile, the costs associated with the recall and related litigation were threatening to bankrupt NaturMed. In an effort to evade its burgeoning liability, Don Elgie, NaturMed's original co-founder, purchased NaturMed's assets, changed the company's name to "Independent Vital Life," and continued selling ADEG products to consumers nationwide.

Plaintiffs are consumers from various states who unwittingly purchased ADEG seeking to improve their health. Some Plaintiffs became seriously ill after consuming the product, others simply experienced no benefit at all. None received the product they thought they were paying for. Accordingly, Plaintiffs bring this motion to certify nationwide and statewide classes seeking relief under state consumer protection statutes, and under the common law of fraudulent concealment and unjust enrichment. The proposed classes are cohesive and will establish Defendants' liability through common proof. For the reasons set forth below, Plaintiffs respectfully request that the Court grant this motion for class certification so that they may seek to hold Defendants accountable for their widespread scheme to defraud.

## I. FACTUAL BACKGROUND

### A. The Relationship Between NaturMed and Bactolac.

NaturMed was founded in 2001 in Camp Verde, Arizona by Don Elgie and Jay White as a "mail order company" that sold dietary supplements direct to consumers using direct-mail advertising. (Ex. 1 at 17:22-25, 18:10-11; Ex. 2 at 35:10-11; 88:2-7.[1]) NaturMed created a "brand name," called the Institute for Vibrant Living, or "IVL," under which it sold all of its supplement products. (Ex. 1 at 19:3-10.) The "IVL" insignia was stamped on all NaturMed materials, including its flagship product, All Day Energy Greens ("ADEG"). (Ex. 3 at 9:10-24; 10:8-11; Ex. 1 at 25:19-26:7.) NaturMed sold almost all of its products, including ADEG, directly to consumers who placed orders through NaturMed's call center. (Ex. 2 at 253:21-256:2.) After receiving an order, product was shipped from NaturMed's warehouse directly to the customer. (*Id.*)

---

[1] Plaintiffs refer herein to Exhibits attached to the Declaration of James J. Bilsborrow in Support of Plaintiffs' Motion for Class Certification (hereafter, "Bilsborrow Decl."), served herewith.

NaturMed did not manufacture its dietary supplement products; it contracted with supplement manufacturers like Bactolac to do so. Bactolac is a contract manufacturer of dietary supplement products, sports supplements, and multivitamins located in Hauppauge, New York. (Ex. 4 at 97:4-11; Ex. 5 at 16:19-21.) For many years, Bactolac manufactured the "vast majority" of NaturMed's products, including ADEG. (Ex. 6 at 48:16-49:10; Ex. 2 at 204:25-205:14.) Bactolac did not sell any of the products it manufactured directly to consumers, though its personnel understood that NaturMed sold Bactolac-manufactured products directly to purchasers, most of whom were over sixty years of age. (*See* Ex. 4 at 174:16-22.)

In March 2010, NaturMed and Bactolac executed a Manufacture and Supply Agreement ("MSA"). (Exhibit 7.) Pursuant to the MSA, NaturMed transmitted purchase orders when it required additional product and Bactolac was responsible to manufacture, package, label, pack for shipment, and timely deliver that product to NaturMed. (*Id.* § 2.1.) The MSA obligated Bactolac to deliver products to NaturMed in compliance with each product's specifications, or formula, and to provide a "batch sheet" showing the ingredients used in each product and the quantities in which those ingredients were used.[2] (*Id.* § 3.1.) Bactolac was also obligated to provide a "certificate of analysis" with each finished product shipment showing the results of certain analytical testing and confirming that the product complied with its specifications. (*Id.*)

When NaturMed and Bactolac collaborated to manufacture and sell any product, including ADEG, both parties were jointly responsible for specifying which ingredients to include and the

---

[2] A "batch sheet" or "batch record" describes the entire manufacturing process for a specific lot of manufactured product. (Ex. 2 at 233:14-235:22.) The batch sheet includes the product formula, the name of each ingredient contained in the product, the amount of each ingredient to be included in the product, as well as the amount actually included during the manufacturing process. (*Id.* at 232:14-233:13.) Batch sheets are of critical importance because they identify the ingredients that are set forth on the product label. (Ex. 1 at 247:24-248:10.)

quantities in which to include them. (Ex. 8 at Copley_Bacto_00037245.) Bactolac was responsible for purchasing the raw materials to manufacture the product, as well as performing quality control on its raw material suppliers. (*Id.*) NaturMed was responsible for the content and appearance of the product packaging, including the product labels. (*Id.*)

Long before NaturMed and Bactolac executed the MSA, the parties began collaborating on ADEG. In 2003, NaturMed approached Bactolac about creating a "greens" formula for a dietary supplement and the two companies jointly developed a product formula.[3] (Ex. 1 at 107:22-108:2, 108:9-19.) The formula for ADEG consisted of 41 total ingredients, 38 of which NaturMed claimed were fruits or vegetables (*See* Ex. 9; Ex. 10 at 36-37; Ex. 6 at 28:14-29:4.) ADEG Fruity consisted of an additional two ingredients, added to give the product a fruity taste. (Ex. 1 at 51:10-25.) Bactolac agreed to manufacture the product for NaturMed at a price of $5.00 to $5.50 per canister, a price that was virtually unchanged from 2003 to 2015. (Ex. 1 at 60:12-15; Exhibit 11.)

NaturMed sold one canister of ADEG for $39.99, but it frequently ran promotions discounting the per-canister price if customers purchased multiple units. (Ex. 12 at Answer No. 6.) For years, ADEG was NaturMed's best-selling product, so much so that NaturMed typically was unable to keep inventory in stock. (Ex. 3 at 14:12-19; Ex. 2 at 135:8-15.) From 2003 until July 2015, Bactolac was the sole manufacturer of ADEG and, although the cost of raw materials steadily rose over time, Bactolac did not increase the price it charged NaturMed to manufacture ADEG, causing Bactolac to lose profit on its manufacturing arrangement while NaturMed's profits continued to increase. (Ex. 5 at 214:16-216:19; Exhibit 13.)

---

[3] "Greens" products refer to supplements that consist of vegetables, fruits, algaes and/or grasses that have been blended into powdered form. There are a number of "greens" products available on the supplement market. *See, e.g.*, "Super Greens: Are Greens Powders Healthy?," Marsha McCulloch, Nov. 26, 2018, *available at* healthline.com/nutrition/super-greens (last visited Sept. 18, 2020).

## B.     ADEG Product Claims.

Marketing materials for ADEG made numerous representations about the best-selling product. Those materials consistently represented to consumers that one serving of ADEG contained 38 fruits and vegetables, or "superfoods." (Ex. 14 at 3; Ex. 10 at Copley-0000473 to 0000474.) These 38 "superfoods" were often itemized, setting forth the benefits of each ingredient. (Ex. 14 at 3; Ex. 10 at Copley-0000487.) ADEG purportedly provided, "A Whole Day's Worth of Veggies and Fruits in a Single Spoonful!" (Ex. 10 at Copley-0000473.) The product purported to "reverse the cellular damage that can lead to fatigue—giving you the kind of all-day energy you haven't felt in decades!" (*Id.* at Copley-0000470.) "Pot bellies, love handles, thunder thighs, bat wings, double (and even triple) chins" would "dissolve away—leaving behind a slimer, sexier, more self-confident person at last." (*Id.* at Copley-0000472.) ADEG could "[r]everse 10, 20, 30, even 40 years of aging," and promised "clockwork regularity" and "complete relief from years of constipation" and "Crohn's." (*Id.* at Copley-0000480, 0000482, 0000486.) Consuming ADEG would allow one to "Defeat diarrhea, gas, bloating and cramps"; "Boost your brainpower and memory—so you no longer forget your keys"; "Enhance your immunity—so when everyone else is coughing, YOU will be just fine"; "Balance your blood sugar so you dodge diabetes"; "Trash your cane, walker or wheelchair and become pain-free and mobile again"; and "Maintain sharp, clear vision for life." (*Id.* at Copley-0000486.) NaturMed's product brochures claimed, "All Day Energy Greens is 100% guaranteed to work for you, or you pay NOTHING." (*E.g.*, *id.* at Copley-0000474.)

ADEG labels, which NaturMed designed and Bactolac affixed to each canister, made additional representations to the consumer. Each label of ADEG claimed that it "Exceeds the nutritional equivalent of FIVE servings of fruits and vegetables!" (Exs. 15-17.) The label further

claimed ADEG "Naturally Increases Energy"; "Improve[s] Digestions"; was "Rich in Antioxidant Superfoods"; and "Promotes Acid/Alkaline Balance." (Exs. 15-17.) Each ingredient purportedly contained in the product was identified on the label and the quantities of several ingredients were set forth in a "Supplement Facts" box. (Ex. 17.)

Because it jointly formulated the product, Bactolac was well aware of the representations set forth on the ADEG label. In addition, Bactolac's quality assurance personnel reviewed product labels in-house to ensure the product contents were consistent with the product formula and the information in the supplement facts panel was accurate. (Ex. 18 at 52:3-53:3.) The MSA also required Bactolac to apply labels to the products before shipping them back to NaturMed for sale to the customer. (Ex. 7 § 2.1.)

Neither the ADEG marketing materials nor the ADEG labels warned that ingestion of the product may cause gastrointestinal distress, nausea, vomiting, or diarrhea. ADEG marketing materials and labels also failed to advise consumers that certain ingredients identified on the label and in the product formula may not be included within the product or that the product may include ingredients, including potential allergens, gluten, and weeds, that were not identified on the label or in the product formula. (*See* Ex. 19 at Answer Nos. 5-12.)

### C.  ADEG Causes Significant Customer Illness Beginning in Fall 2014.

In 2013, NaturMed received notification from the National Advertising Division ("NAD"), which regulates advertising in the nutritional supplement industry, that certain product claims made by NaturMed were not factually accurate. (Ex. 6 at 35:18-36:16.) As a result, Gina Lascano, NaturMed's vice president of marketing and merchandising, initiated an internal audit, reviewing the company's standard operating procedures for quality control and product substantiation. (*Id.* at 39:4-11; 43:11-23.) Lascano concluded that NaturMed was failing to comply with federal

regulations regarding manufacturer oversight. (*Id.* at 39:4-11.) In particular, NaturMed was not receiving quality control documentation—including batch records and certificates of analysis—from manufacturers like Bactolac. (*Id.* at 45:10-23; 53:19-54:4.) This documentation was critical so that NaturMed could "make sure the specifications provided for the product formulation are lining [up] with how it was . . . actually formulated." (*Id.* at 54:10-55:3.) When Ms. Lascano and her staff requested this quality control information from Bactolac beginning in 2014, Bactolac did not comply. (*See id.* at 53:9-15.)

From the time it was founded until September 2014, NaturMed did not employ personnel with responsibility for quality control. (Ex. 1 at 32:21-33:1.) In September 2014, however, as a result of Ms. Lascano's internal audit, NaturMed hired Jennifer Cooper to oversee quality control. (*Id.* at 32:10-13; Ex. 2 at 257:16-19.) Shortly after Ms. Cooper was hired, NaturMed began to receive "a huge increase in the amount of complaints" associated with ADEG. (Ex. 2 at 57:20-21.) Ms. Cooper testified that the incoming complaints represented a "massive uptick" from anything NaturMed had previously experienced and the magnitude of complaints would have been "abnormal" even for a company of much larger size. (*Id.* at 191:12-17; *see also* Ex. 1 at 72:11-16 (stating that the incoming complaints were "off the charts").) Many of the incoming complainants reported serious gastrointestinal issues, including vomiting and bloody diarrhea, and some complainants reported they had sought medical treatment as a result. (Ex. 2 at 57:22-24; 59:25-60:3; 67:11-15; 73:2-20.) In addition, many complainants were repeat purchasers of ADEG; some had been taking the product for a decade without incident. Ms. Cooper recognized immediately that something was awry with the product.[4] (*Id.* at 62:20-63:3; Ex. 1 at 68:15-71:15.)

---

[4] Prior to the fall of 2014, NaturMed received at most twenty complaints per year regarding ADEG and most of those concerned the product's taste. (Ex. 1 at 51:20-25; 68:15-71:15.)

As complaints continued to roll in throughout October 2014, Ms. Cooper initiated an investigation to identify the cause. Among other things, she notified Bactolac, provided it with a spreadsheet documenting the incoming complaints, and scheduled a site visit for the end of the month. (Ex. 2 at 68:13-69:5.) Ms. Cooper also requested that Bactolac provide her with documentation related to the FDA's most recent audit of Bactolac's facilities. (*Id.*) Bactolac refused to provide the audit, which Ms. Cooper described as "insanity given that we were dealing with a horrific event here." (*Id.* at 220:16-221:13; 221:17-222:5.) Cooper traveled to Bactolac to observe the manufacturing process at the end of October.

Both Ms. Cooper and Bactolac personnel tested certain raw materials for the presence of pathogens or other specific contaminants, but could find none. (*Id.* at 153:8-16.) Ms. Cooper testified that such testing is often ineffective, however, explaining that there is "an infinite possibility" for foreign contaminants and it is difficult to identify those contaminants without knowing what to look for. (*Id.* at 199:17-200:13.) Bactolac strongly rejected any suggestion that it was the cause of any customer complaints or foreign contaminants in the product; Bactolac's CEO, Dr. Pailla Reddy, claimed "[t]here is no way that there could be any problems whatsoever with our product." (Ex. 1 at 87:19-25.) Bactolac "stonewall[ed]" NaturMed's investigation and accused NaturMed of contaminating its own product. (*Id.* at 90:23-91:19.) At one point, Bactolac's director of product development, Vijay Bhatt, accused Ms. Cooper of intentionally poisoning the ADEG herself. (*Id.*) Meanwhile, customer complaints continued to roll in, consuming the attention of NaturMed's board of directors. (*Id.* at 72:17-25.) NaturMed considered halting sales of ADEG, but ultimately continued selling its flagship product. (Ex. 1 at 78:3-15; Ex. 20.)

In December 2014, suspecting that Bactolac was adulterating the product, NaturMed asked Bactolac to certify that ADEG was "safe for human consumption," and was neither "adulterated"

nor "misbranded." (Ex. 21; Ex. 1 at 99:16-20, 106:20-107:8.) According to Jay White, NaturMed's Executive Vice President and a member of the board, it was important for Bactolac to "stand[] up for the integrity, excellence, [and] quality of the product" and to do so "on the record." (Ex. 1 at 99:22-100:5.) Bactolac refused to make this certification. Instead, Dr. Reddy sent NaturMed a letter stating that ADEG "was produced . . . in accordance with the formula provided by NaturMed." (Ex. 22.) Dr. Reddy's letter failed to satisfy NaturMed, for "it was most important for NaturMed that Bactolac certify that the product [was not] adulterated, misbranded, and that it was safe for human consumption." (Ex. 1 at 107:9-20.) Mr. White wrote to Dr. Reddy, expressing "disappoint[ment] that Bactolac is unwilling to say, as an absolute minimum, that ADEG is safe for human consumption." (Ex. 23.) Following this exchange, Dr. Reddy provided another letter, this time certifying that ADEG was "safe for human consumption." (Ex. 24.) Renee Reynolds, Bactolac's CFO, testified that this letter was provided "under duress," and the company was "not 100 percent comfortable" with the certification, but felt it necessary to continue its manufacturing relationship with NaturMed. (Ex. 5 at 172:16-173:12.) Ms. Cooper testified that Bactolac was not "forthright" and was "disingenuous" during its investigation. (Ex. 2 at 168:22-25.)

Although NaturMed continued receiving customer complaints through the end of 2014 and into 2015, it did not halt or slow its sales of ADEG and it provided no public warnings about the gastrointestinal issues befalling its customers. NaturMed was also still unable to pinpoint the root cause of these customer complaints, but its board members nonetheless concluded that Bactolac was contaminating the product. (Ex. 1 at 133:25-134:20.) Accordingly, NaturMed began looking for a manufacturer to replace Bactolac. This process proved difficult, however, because prospective manufacturers were not able to replicate ADEG at a price anywhere close to that offered by Bactolac—$5.00 to $5.50 per canister. (Ex. 25.) Prospective manufacturers told

NaturMed that "nobody could make this product for what you were buying it for," (Ex. 1 at 132:19-133:13); NaturMed received bids that would cost upward of $2 more per canister than what Bactolac charged.[5] (Ex. 25.)

NaturMed received hundreds of complaints per month throughout the spring of 2015. In April 2015, for example, NaturMed received 373 complaints—more than any previous month thus far. (Ex. 27.) Ultimately, even though it would pay 20-30% more to manufacture ADEG with another company, NaturMed decided to terminate its relationship with Bactolac in July 2015. (Ex. 2 at 145:19-146:14; 155:17-22.) NaturMed thereafter hired another company, ANS, to manufacture ADEG using a formula substantially similar to the one utilized by Bactolac; customer complaints immediately declined. (Ex. 2 at 196:5-197:5.) However, although it switched manufacturers and had concluded Bactolac was adulterating its product, NaturMed continued selling its supply of Bactolac-manufactured ADEG without warning to its customers. Unsurprisingly, those Bactolac-manufactured lots continued to cause customer complaints. (*See* Ex. 28 at JC002464-002465, JC002468-002469.)

In March 2016, NaturMed consulted with the Food and Drug Administration (FDA) and commenced a voluntary recall of 99 lots of ADEG manufactured by Bactolac between July of 2014 and June of 2015. In total, these lots comprised over one million canisters of ADEG. (Ex. 28 at JC002470.) NaturMed represented to the FDA that because it sold almost all ADEG directly to consumers, it was able to send a customized recall letter to each purchaser of a recalled canister. (Ex. 29 at NTMED-AZ 0001815; Ex. 2 at 256:3-23.) Indeed, NaturMed sent over 218,000 such

---

[5] Ms. Cooper testified that she was not able to replicate ADEG using the ingredients set forth in the master formula. Indeed, her attempt to do so "did not result in the product that our consumer expected to get," suggesting Bactolac was not following the formula set forth in the master document. (Ex. 26 at 44:1-45:3.) This further added to the difficultly prospective manufacturers faced in attempting to replicate the product.

notices. (Ex. 28 at JC002470.) NaturMed offered a refund to customers who returned or destroyed their remaining product; NaturMed refunded over $2.7 million as part of this process, accounting for approximately 34% of the recalled products. (Ex. 28 at JC002470-002471.)

### D. NaturMed Performs DNA Testing in 2016 and Learns of Product Adulteration.

Following the product recall, a number of individuals filed lawsuits against NaturMed and Bactolac, alleging they suffered various personal injuries caused by consumption of ADEG. *See, e.g.*, *Mooneyham v. NaturMed, Inc. et al.*, No. 3:17-cv-00162 (E.D. Ala.) (hereafter, "*Mooneyham*"). In the course of defending against these suits, NaturMed engaged one of the premier laboratories in the industry, NSF Authentechnologies, to conduct DNA product testing on ADEG samples taken from eight different lots.[6] (Ex. 26 at 78:6-20; Ex. 31.) NSF's analysis found that only approximately 50% of the label ingredients whose plant DNA was likely to be detected by such testing were actually present in the samples. (Ex. 26 at 78:21-80:20.) In addition, across the eight samples, NSF detected DNA from a total of 92 plant species that were not part of the ADEG formula and were not identified on the ADEG label. (*Id.* at 80:21-81:21.) Among other things, the NSF analysis detected peanut, several species of weed, nightshade, and wheat, none of which are part of the ADEG formula. (*Id.* at 83:18-84:4.) As Ms. Cooper explained,

> [W]e did the testing, because we expected that something expensive might be being subbed for something cheap. . . . But we didn't expect the magnitude of that. We thought we might find one or two items that maybe were routinely—that maybe there was some fudging on. But that is a gross discrepancy from our certificate of analysis, from our master manufacturing record, and from the label."

---

[6] DNA analysis of dietary supplements typically utilizes one of several techniques to identify species-specific differences in a short standardized region of plant DNA. (*See* Ex. 30 at 6.)

(*Id.* at 81:15-18.) One of NSF's lab analyses was provided to Bactolac's director of quality assurance, Vanessa Jackson, who also explained that the testing "did not find the following materials which should be present in the product: Aloe; Raspberry; Yucca; Echinacea; Damiana; Eleuthero; Grape; Nopal Cactus; Stevia; Watercress; Gingko." (Ex. 32.) Ms. Jackson added, "Additionally, they found a bunch of items in the product that are not supposed to be there."[7] (*Id.*)

Testimony in the *Mooneyham* litigation uncovered additional evidence of adulteration. William Gonzalez, a former Bactolac employee, testified that he operated one of the blending machines in which the raw materials were mixed into a powder form. (Ex. 35 at 15:5-8.) Mr. Gonzalez testified that the batch records, which are supposed to reflect the identity and quantity of the raw materials used in each lot, were falsified by Bactolac management personnel. (*Id.* at 19:11-20:5; 27:9-29:9; 30:5-31:12; 32:9-33:1.) Blenders' signatures were forged; the batch records appeared as if each blender was certifying that he or she had used specific quantities of specific ingredients in each mix, but Mr. Gonzalez testified that the blenders did not make these certifications. Another former employee, who also operated blending machines, corroborated Mr. Gonzalez's testimony, explaining that certifications on the batch records regarding the identity and quantity of raw materials were false. (*See* Ex. 36 at 13:12-14:6.) As Ms. Cooper explained, federal

---

[7] One of Bactolac's proposed experts in this case, Dr. Kendal Hirschi, acknowledged that product adulteration is a persistent problem in the dietary supplement industry. One peer reviewed paper relied upon by Dr. Hirschi found that "as the popularity of herbal dietary supplements has increased, so have the reports of adulteration. This admixture or substitution of herbal products/supplements with materials of substandard quality is a growing concern since it may lead to decreased efficacy and the occurrence of serious adverse events. Price pressure, increased demand, limited availability of medicinal herbs, and greed of unscrupulous suppliers are some of the reasons for the intentional substitution of botanical ingredients." (Ex. 33 at 1225-26; *see also* Ex. 34 at 126:15-128:18.) Dr. Hirschi further acknowledged that for years Bactolac manufactured ADEG without materially raising its prices. (Ex. 34 at 128:24-129:14.) Bactolac's price was so low, in fact, no other manufacturer could come close to it. Plaintiffs contend that Bactolac was able to keep its prices low because it was not in fact following the ADEG formula and was using cheaper raw materials or omitting certain ingredients entirely.

regulations require truthful and accurate batch records; the batch record must "have the amount, the recipe amount that goes in. You need to have what you actually put in and then signed off, and these have to be signed in pen." (Ex. 2 at 232:14-233:13.) Bactolac falsified its batch records to make it appear as if it was adhering to the ADEG formula when in reality it was not.

### E.    Plaintiffs' DNA Analysis Confirms the Testing Conducted in *Mooneyham*.

Plaintiffs in this matter retained Dr. Damon Little to perform further DNA analyses on 17 additional samples of ADEG that have been maintained in a temperature-controlled storage unit since the recall. (Ex. 30 at 12.) Each sample was taken from one of the 99 recalled lots that was not analyzed by NSF. Dr. Little designed a testing protocol along with a third-party laboratory, DNA4 Technologies, LLC, and performed a DNA analysis called "Next Generation Sequencing." (*Id.*; Ex. 37 at 80:8-81:6.) Dr. Little's analysis concluded that "each of the 17 lots of ADEG sampled in this analysis contained DNA from non-label ingredients. DNA from a number of label ingredients were also not present in each of the 17 lots sampled." (Ex. 30 at 20.) In other words, Dr. Little's analysis, like the analysis conducted earlier by NSF, showed that each sampled canister of ADEG contained DNA from plant species not included in the product formula and also failed to detect DNA from each of the plant species one would reasonably expect to detect based on the product formula and ingredients identified on the ADEG label.[8] Among other things, Dr. Little's analysis detected cashew, tobacco, and invasive weeds present in ADEG; these ingredients are not part of the product formula. (*Id.* at 18.) Wheat species were present in high concentration, but wheat is not an ADEG ingredient. (*Id.* at 16.) Pineapple was present in lots where it should not have been. (*Id.* at 19-20.) Multiple lots were missing key ingredients like alfalfa, spinach, ginger,

---

[8] As Dr. Little explains in his report, he did not expect to find detectable DNA from every ADEG ingredient. (*See* Ex. 30 at 13.)

and dulse. (*Id.* at 19.) These are just some examples of the deviations from the product formula found in Dr. Little's analysis. Just as NSF had found, ingredients were present that should not have been present; ingredients were absent that should have been detected.

Given the results obtained by Dr. Little and NSF, Dr. Charles Cowan, an expert in statistics and economics, assessed the probability that all of the canisters in all 99 lots would contain non-label ingredients and also lack certain required label ingredients.[9] Dr. Cowan explains that given the results obtained from DNA testing thus far, there is a 95% chance that more than 90 of the 99 lots will show results consistent with those obtained by Dr. Little and NSF—ADEG canisters that contain non-label ingredients and also do not contain certain ingredients set forth on the product label and in the product formula. (Ex. 38 at 10; Ex. 39 at 130:8-13.) Furthermore, it is more likely than not that all 99 lots will contain non-label ingredients and also lack certain ingredients set forth on the product label. (Ex. 38 at 11.) Simply put, it is more likely than not that all 99 recalled lots will generate results consistent with Dr. Little's analysis, meaning that all 99 lots will not be what they purport to be to the consumer. This conclusion is unsurprising given the testimony and evidence of adulteration uncovered in the case thus far.

### F.    ADEG Misrepresentations and Omissions in Light of DNA Testing Evidence.

The DNA testing analyses performed by both Dr. Little and NSF demonstrate that certain statements appearing in marketing material or on the ADEG label are misrepresentations. NaturMed's claim that one serving of ADEG contained 38 different fruits or vegetables is untrue; not one of the recalled lots contained all of the label ingredients and therefore none of those lots contain the 38 fruits and vegetables intended to be contained in each serving of ADEG. The ADEG label sets forth each ingredient in the formula and identifies the quantities of some of those

---

[9] Dr. Cowan referred to these as "contaminated" canisters. (Ex. 38 at 2, 6.)

ingredients. The ingredient list is inaccurate and the quantities listed on each canister is also likely inaccurate.

Other representations—such as the label claim that each serving is "the nutritional equivalent" of five servings of fruits and vegetables—may or may not have been accurate with regard to a non-defective canister of ADEG. But with respect to the recalled lots, none of which contained all of the label ingredients but instead contained a variety of non-label ingredients, this claim is unlikely to be accurate. Other label claims—that product use will lead to weight loss, clear vision, youthful energy, improved digestion, relief from Crohn's disease, balanced blood sugar, and elevated brainpower—are also unlikely to be accurate given that the product is not what it purports to be.

ADEG labels and advertising materials also omitted material information regarding the product's qualities. Consumers were not warned that the so-called nutritional product contained a variety of ingredients not identified on its label, some of which may be allergens, contain gluten, or generally be unfit for human consumption. Consumers were not advised that some of the label ingredients may not be present in the product or may not be present in the quantities set forth on the label. Neither ADEG's label nor NaturMed's marketing materials ever provided a warning that consumption of ADEG may cause gastrointestinal distress, vomiting, diarrhea, or any other form of physical illness. (Ex. 19 at Answer Nos. 5-12.) Finally, the ADEG label and NaturMed's marketing materials failed to warn consumers that the product they were considering may be adulterated or misbranded.

**G.    Independent Vital Life Obtains NaturMed's Assets.**

NaturMed's product recall and subsequent legal liability caused it significant financial difficulty. In 2017, at risk of bankruptcy, one of NaturMed's owners and its co-founder, Don Elgie,

purchased the company's assets (or, to be more precise, those assets he did not already own). Elgie created a "new" company called Independent Vital Life (hereafter, "IVL2"), which conveniently used the "IVL" branding NaturMed had used for years, and continued selling ADEG nationwide. Plaintiffs contend that this was a fraudulent transfer and that IVL2 is legally liable for NaturMed's misconduct in marketing and selling ADEG.

### H. Plaintiffs' Purchase and Use of ADEG.

Each of the named Plaintiffs in this matter purchased one or more canisters of ADEG from the recalled lots. For some Plaintiffs, this was their first purchase of ADEG; others had used the product for longer. Certain Plaintiffs became ill after consuming ADEG. (*See* Ex. 40 at 19:19-25; Ex. 41 at 15:11-23; Ex. 42 at 25:13-18; Ex. 43 at 21:15-22:3; Ex. 44 at 98:17-99:5; Ex. 45 at 36:15-24; Ex. 46 at 34:24-25; Ex. 47 at 33:14-15; Ex. 48 at 18:20-22.) Other Plaintiffs were more fortunate and did not become ill. No Plaintiff testified that the product helped them lose weight, gave them clear vision, provided youthful energy, improved their digestion or cured their Crohn's disease, balanced their blood sugar or elevated their brainpower. ADEG was, at best, a product that did not make Plaintiffs seriously ill.

Plaintiffs consistently testified that they believed that the ADEG label and marketing materials were accurate and that they erroneously believed the product would confer health benefits. (Ex. 40 at 13:13-21; Ex. 41 at 17:1-6, 18:8-10; Ex. 42 at 22:8-9, 60:1-10, 61:15-18, 94:18-23; Ex. 43 at 12:4-11, 64:20-23; Ex. 44 at 22:8-12, 70:16-22, 72:19-23, 75:3-8; Ex. 45 at 88:15-23, 132:7-9; Ex. 46 at 20:3-14; Ex. 47 at 11:23-12:11, 27:15-16; Ex. 48 at 28:9-11, 50:1-5; Ex. 49 at 27:5-9, 58:5-13, 76:11-16; Ex. 50 at 69:4-5.) Plaintiffs testified that had they known non-label ingredients were used to manufacture the product, they would not have purchased it. (Ex. 40 at 31:10-15; Ex. 41 at 29:17-24; Ex. 42 at 72:25-73:5; Ex. 43 at 42:16-19; Ex. 45 at 146:4-7; Ex. 46

at 83:21-24; Ex. 47 at 27:5-12; Ex. 48 at 28:12-15; Ex. 49 at 81:16-22; Ex. 50 at 63:19-64:4; Ex. 51 at 308:6-9.) Prior to purchasing the product, no Plaintiff understood that consumption of ADEG may cause gastrointestinal distress, vomiting, diarrhea, or any other physical illness. (Ex. 42 at 111:6-9; Ex. 43 at 93:24-94:2; Ex. 44 at 86:14-15, 99:6-9; Ex. 45 at 43:15-18; Ex. 46 at 73:23-74:2.)

### I. Plaintiffs' Evidence Demonstrates Classwide Damages Are Available Through Common Proof.

Plaintiffs' expert in statistics and economics, Dr. Charles Cowan, has provided a methodology to calculate classwide damages. Because it is more likely than not that all canisters from the 99 lots both contain non-label ingredients and do not contain all of the ingredients set forth on the label and the product formula, no purchasers of recalled products obtained what they intended to purchase. Instead, Plaintiffs and class members purchased a worthless mixture that did not deliver on any of the promised benefits, contained non-label contaminants, and in some circumstances caused serious illness. Accordingly, and as set forth in more detail below, all purchasers of recalled products are entitled to reimbursement for purchasing a defective product. Dr. Cowan assumes that this reimbursement should be a full refund. (Ex. 38 at 11.) Using sales and refund data produced by NaturMed, Dr. Cowan developed a methodology to calculate both nationwide damages, as well as statewide damages for the proposed statewide classes. (*Id.* at 11-21.) Because NaturMed and/or IVL2 has in its records individual sales and refund information for each purchaser of the recalled products, Dr. Cowan also proposed a methodology to determine

individual damages should the class be certified and the purchase data for each class member be produced.[10] (*Id.* at 22-25.)

## II.     THE PROPOSED CLASSES

As set forth in more detail in the accompanying Notice of Motion for Class Certification, Plaintiffs propose to certify a nationwide class proceeding against Bactolac under New York General Business Law § 349. Plaintiffs also propose a nationwide class proceeding against NaturMed and IVL2 under the Arizona Consumer Fraud Act. The nationwide classes are defined as: All persons in the United States who purchased one or more canisters of All Day Energy Greens that were manufactured as part of the Recalled Lots. Plaintiffs Faris, Copley, Evans, Humberto Garcia, Luz Angelina Garcia, McDonald, Peterson, Skare, Stone, Wink, Cannon, Hampton, and Robles seek to represent the nationwide classes.

Plaintiffs also propose statewide classes to proceed jointly against all Defendants under the state laws of Arizona, California, Florida, Illinois, Kentucky, Missouri, New York, Oregon, South Carolina, Texas, Virginia, Washington, and Wisconsin.[11] For each of these proposed statewide classes, Plaintiffs raise the following claims: a claim under each state's respective consumer protection statute, a claim for fraudulent concealment under state common law, and a claim for unjust enrichment under state common law.[12] The statewide classes are defined as: All citizens of

---

[10] NaturMed has produced individual sales and refund information for the named Plaintiffs, but not for putative class members. Should one or more classes be certified, Plaintiffs will request individual sales and refund information for each member of the class.

[11] Plaintiffs pled a claim arising under the Alabama Consumer Protection Act, but they do not seek certification of an Alabama statewide class here.

[12] In the amended complaint, Plaintiffs pled claims for breach of express and implied warranty arising under various states' laws, as well as a violation of the Magnuson Moss Warranty Act and negligent misrepresentation claims under state law. In the interest of Rule 23(b)(3) trial manageability, Plaintiffs do not seek certification of any state or nationwide classes asserting breach of warranty or negligent misrepresentation and instead pursue claims only under state consumer protection statutes, common law fraudulent concealment, and common law unjust

[name of state] who purchased one or more canisters of All Day Energy Greens that were manufactured as part of the Recalled Lots. Each named Plaintiff seeks to represent a statewide class in his or her state of residence.

Excluded from the nationwide and statewide classes are Defendants, as well as any entity in which Defendants have a controlling interest; the judges to whom this case is assigned, as well as their respective court staffs; governmental entities; and any individual who purchased one or more canisters of All Day Energy Greens manufactured from a Recalled Lot and who received a full refund for his or her purchase. The class definitions, exclusions, defined terms, and proposed class representatives are set forth in more detail in Plaintiffs' Notice of Motion for Class Certification.

## III.    PROCEDURAL HISTORY

Plaintiffs filed a class action complaint in this matter on January 26, 2018. (Dkt. 1.) Plaintiffs filed an amended complaint naming Bactolac, NaturMed, and IVL2 on July 13, 2018. (Dkt. 57.) NaturMed filed an answer and cross-claim for indemnification against Bactolac on July 27, 2018. (Dkt. 60.) Bactolac filed a motion to dismiss some, but not all, of Plaintiffs' claims on November 30, 2018.[13] (Dkts. 80, 92-93.) Bactolac's motion was fully briefed on February 28, 2019

---

enrichment. In addition, Plaintiffs do not seek to certify a statewide consumer protection class under Kentucky's consumer protection act or a statewide class under Texas law for unjust enrichment. As set forth in detail below, there is significant similarity among the state consumer protection statutes pled here, as well as the elements necessary to prove fraudulent concealment and unjust enrichment in the jurisdictions at issue.

[13] In particular, Bactolac did not move to dismiss the following claims pled in the amended complaint: (1) Claim II – Violation of the Arizona Consumer Fraud Act; (2) Claim IV – Fraudulent Concealment; and (3) Claim XXXV – Negligent Misrepresentation. (*See* Dkts. 92-93.)

and is pending dispotion.[14] (Dkt. 91.) Neither NaturMed nor IVL2 moved to dismiss pursuant to Rule 12.

Following briefing on Bactolac's motion to dismiss, the parties proceeded to engage in discovery. To avoid repeating discovery that was conducted in related lawsuits pending in other jurisdictions, however, the parties agreed that sworn deposition testimony taken in such matters may be utilized in this case as if conducted herein.[15] Discovery in this matter closed on February 18, 2020. (Dkt. 119.)

On March 12, 2020, Plaintiffs Faris, Cannon, Hampton, and Robles filed a related putative class action complaint in this Court. (*Faris*, No. 20-cv-1338, Dkt. 1.) The *Faris* matter was consolidated with the *Copley* matter on July 15, 2020. (Dkt. 128.) Discovery in *Faris* closes on December 3, 2020. Plaintiffs now move for class certification of the consolidated matters.

## IV.    ARGUMENT

### A.    Legal Standard Applicable to Plaintiffs' Motion.

Plaintiffs seeking class certification for monetary relief must satisfy the prerequisites set forth in Federal Rule of Civil Procedure 23(a) and (b). *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans &*

---

[14] In its brief in opposition to Bactolac's motion to dismiss, Plaintiffs withdrew the following claims for relief, as asserted against Bactolac: (1) Claim VI – Breach of Express Warranty under Alabama law; (2) Claim VII – Breach of Implied Warranty under Alabama law; (3) Claim VIII – Violation of the California Consumer Legal Remedies Act; (4) Claim XIV - Violation of the Kentucky Consumer Protection Act; (5) Claim XV – Breach of Express Warranty under Kentucky law; (6) Claim XVI – Breach of Implied Warranty under Kentucky law; (7) Claim XVIII – Breach of Express Warranty under Missouri law; (8) Claim XXII – Breach of Implied Warranty under Oregon law; (9) Claim XIV – Breach of Express Warranty under South Carolina law; (10) Claim XV – Breach of Implied Warranty under South Carolina law; (11) Claim XXVII – Breach of Express Warranty under Texas law; (12) Claim XXVIII – Breach of Implied Warranty under Texas law; (13) Claim XXXIII – Breach of Express Warranty under Wisconsin law; and (14) Claim XXXIV – Breach of Implied Warranty under Wisconsin law.

[15] Other than the *Mooneyham* matter, which pleads no putative class allegations, Plaintiffs are not aware of any currently pending suits related to the above-captioned matter.

*Trust Funds*, 568 U.S. 455, 459 (2013) (articulating standard for class certification); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 79-80 (2d Cir. 2015). Rule 23(a) requires the plaintiff to show "(1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). For a class requesting monetary relief, the plaintiffs must show that there are "questions of law or fact common to class members [that] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs bear the burden to demonstrate by a preponderance of the evidence that the prerequisites of Rule 23 have been satisfied. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). This may require the court to "'probe behind the pleadings before coming to rest on the certification question,' satisfying itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Accordingly, the Court may consider underlying issues that speak to the merits of the case, but only to the extent those merits issues are germane to one of the class certification requirements. *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir. 2006). However, "in making such determination, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Stinson v. City of New York*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012) (internal citations and quotation marks omitted).

In the Second Circuit, a district court's class certification ruling will not be disrupted absent an abuse of discretion. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) When the district court has denied class certification, however, the appellate court will apply a "noticeably less deferential standard." *Id.* (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 224-25 (2d Cir. 2006)).

**B.    The Court Should Certify the Proposed Nationwide Classes and Statewide Classes Pursuing Remedies Under State Consumer Protection Statutes.**

Plaintiffs seek to certify a nationwide class under New York law to pursue a New York General Business Law ("GBL") § 349 claim against Bactolac and a nationwide class under Arizona law to pursue an Arizona Consumer Fraud Act ("Arizona CFA") claim against NaturMed and IVL2. In addition, Plaintiffs seek to certify statewide classes under the laws of Arizona, California, Florida, Illinois, Missouri, New York, Oregon, South Carolina, Texas, Virginia, Washington, and Wisconsin to pursue remedies against all Defendants under each state's consumer protection statute.[16]

**1.    The Consumer Protection Classes Satisfy Rule 23(a).**

**a.    The Numerosity Requirement is Satisfied.**

To satisfy the numerosity requirement, the proposed classes must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, there is a presumption that a putative class of 40 or more members satisfies the numerosity requirement. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). At the class certification stage, Plaintiffs need not present evidence of the exact class size, but must provide a reasonable estimate of the number of class members. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

---

[16] Each state consumer protection statute is identified in Plaintiffs' Notice of Motion for Class Certification.

Here, NaturMed represented to the FDA that it was able to identify all, or almost all, customers who purchased ADEG from one of the recalled lots. (Ex. 2 at 256:3-23.) NaturMed mailed over 218,000 recall letters and refunded approximately 34% of the recalled products, (Ex. 28 at JC002470-002471), meaning there are tens of thousands of class members who purchased defective canisters but did not receive refunds. In addition, NaturMed made significant sales of ADEG—in the tens or hundreds of thousands of dollars—in each state at issue in this case. (*See* Ex. 12 at Answer No. 8.) The scope of these sales indicates there are at least hundreds of class members in each proposed statewide class. Numerosity is satisfied.

### b.    The Commonality Requirement is Satisfied.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2)'s commonality prerequisite is satisfied if there is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sykes*, 780 F.3d at 84 (quoting *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)). As the Supreme Court explained in *Dukes*, "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). This Court has held that classes pursuing violations of consumer protection statutes like GBL § 349, which prohibit material misrepresentations or omissions in commerce, often satisfy the commonality requirement. *See, e.g.*, *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 530-31 (E.D.N.Y. 2017) (citing cases), *remanded on other grounds*, *Kurtz v. Costco Wholesale Corp.*, 768 F. App'x 39 (2d Cir. 2019); *see also Sykes*, 780 F.3d at 83-84 (affirming certification of GBL § 349 class); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405

(S.D.N.Y. 2015) (commonality satisfied in GBL § 349 class alleging product that claimed to grow grass seed does not actually grow grass).

Here, there are a number of common legal and factual questions that are apt to drive the resolution of this litigation. All putative class members suffered the exact same injury deriving from the same nucleus of misconduct: in particular, all class members purchased a dietary supplement that did not contain what it purported to contain and was therefore incapable of providing consumers with the fruits and vegetables they were promised and delivering the health benefits claimed on the product label and in advertising materials. Class members will raise numerous common questions regarding Defendants' liability, including (1) whether Bactolac intentionally or negligently added non-label ingredients to ADEG; (2) whether Bactolac intentionally or negligently withheld label ingredients that ADEG purported to contain; (3) whether NaturMed knew or should have known that Bactolac was not complying with the ADEG formula; (4) whether NaturMed and Bactolac had a duty to inform and/or warn purchasers that ADEG's labels were false or misleading, or that consumption of ADEG could cause gastrointestinal distress, vomiting, or diarrhea; (5) whether NaturMed had a duty to monitor and/or test ADEG to ensure Bactolac was complying with the ADEG formula; (6) whether NaturMed and/or Bactolac violated applicable legal duties by manufacturing and selling ADEG that was defectively manufactured; (7) whether ADEG as manufactured by Bactolac was unfit for human consumption, adulterated, or misbranded; (8) whether ADEG was worthless to consumers in the condition in which it was purchased; and (9) whether IVL2 is liable for NaturMed's misconduct under a theory of successor liability.

To prevail against Bactolac under GBL § 349, the nationwide class must show that Bactolac "engaged in consumer-oriented conduct, that is (2) materially misleading, and that (3)

the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)). The New York Court of Appeals has held that GBL § 349 "appl[es] to virtually all economic activity, and [its] application has been correspondingly broad." *Id.* (quoting *Karlin v. IVF Am.*, 712 N.E.2d 662, 665 (N.Y. 1999)). Privity between manufacturer and purchaser is not required. *See, e.g.*, *Deer Consumer Prods., Inc. v. Little Grp.*, 37 Misc.3d 1227(A), 2012 WL 5898052, at *13 (Sup. Ct. N.Y. Cnty. Nov. 15, 2012) (citing cases). NaturMed and Bactolac jointly formulated ADEG, Bactolac adulterated the product by failing to adhere to this formula, Bactolac affixed labels to ADEG canisters that it knew to be false or misleading, and shipped those canisters to NaturMed knowing they would be sold directly to unwitting consumers. This is precisely the sort of deceptive consumer conduct GBL § 349 is intended to prohibit.

Conduct is materially misleading under GBL § 349 if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995); *see also Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) (explaining that GBL § 349 does not require individual reliance, but assesses conduct according to an objective reasonableness standard). In this manner, GBL § 349 applies an objective test; this Court has explained that "[t]ypically . . . where the consumer protection statute at issue supplies an objective test, such claims are considered ideal for class certification because they allow the court to adopt classwide presumptions of reliance and do not require an investigation into class members' individual interaction with the product." *Kurtz*, 321 F.R.D. at 530 (finding commonality satisfied in consumer class alleging GBL § 349 claim); *Harte v. Ocwen Fin. Grp.*, No. 13-CV-5410, 2018 WL 1830811, at *27 (E.D.N.Y. Feb. 18, 2018) (same). The finder of fact will ultimately determine whether the material misrepresentations and omissions

were likely to mislead a reasonable consumer in this case and that determination will apply to each class member uniformly, resolving this central issue in one stroke.

The Arizona CFA, like GBL § 349, "is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions," *In re Arizona Theranos, Inc. Litig.*, 256 F. Supp. 3d 1009, 1022-23 (D. Ariz. 2017), and it prohibits a party from engaging in "any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission," Ariz. Rev. Stat. § 44-1522(A). A statement is "deceptive" if it has the "tendency and capacity to convey misleading impressions to consumers." *Madsen v. W. Am. Mortgage Co.*, 694 P.2d 1228, 1232 (Ariz. Ct. App. 1985) (quotation marks and citations omitted). "Whether a statement has the tendency to mislead is determined from the perspective of the 'least sophisticated reader,' in light of 'all that is reasonably implied, not just from what is said.'" *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826-27 (D. Ariz. 2016) (quoting *Madsen*, 694 P.2d at 1232). Accordingly, the Arizona CFA also applies an objective standard which, like GBL § 349 is "ideal for class certification." *Kurtz*, 321 F.R.D. at 530.

Similarly, all but one of the consumer protection statutes pled by the statewide classes also applies an objective test to determine whether a reasonable consumer was likely to be misled by the defendant's misrepresentations or omissions. *See Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011) (describing standard under California unfair competition and false advertising laws); *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016) (same); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (describing standard under Florida Unfair and Deceptive Trade Practices Act); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1996) (describing standard under Illinois Consumer

Fraud Act); *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 312 (Mo. Ct. App. 2016) (describing standard under Missouri Merchandising Practices Act); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1012-1013 (C.D. Cal. 2015) (describing standard under Oregon Unfair Trade Practices Act), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1339 n.27 (D. Kan. 2018) (explaining that the South Carolina Unfair Trade Practices Act does not require individual reliance); *Spradling v. Williams*, 566 S.W.2d 561, 562-64 (Tex. 1978) (describing standard under Texas Deceptive Trade Practices Act); *In re ConAgra*, 90 F. Supp. 3d at 1016-17 (same); *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 17-18 (Wash. 2007) (describing standard under Washington Consumer Protection Act); *Novell v. Migliaccio*, 309 N.W.2d 132, 150-51 (Wis. 2008) (describing standard under Wisconsin Deceptive Trade Practices Act).

Under the law of these jurisdictions, the finder of fact will thus make a determination whether Defendants' misrepresentations and omissions in this case were likely to mislead a reasonable consumer and that determination will apply to each of the proposed classes uniformly. Commonality is therefore satisfied. *See Kurtz*, 321 F.R.D. at 530 (finding commonality satisfied in cases in which consumers sought certification under a consumer protection statute applying an "objective test" of reasonableness); *see also In re McCormick & Co., Inc. Pepper Prods. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 236 (D.D.C. 2019) ("As numerous courts have recognized, a claim concerning alleged misrepresentations on packaging to which all consumers were exposed is sufficient to satisfy the commonality requirement because it raises the common question of whether the packaging would mislead a reasonable consumer." (internal quotation omitted)).

The Virginia Consumer Protection Act ("Virginia CPA") requires a showing of reliance in cases alleging the defendant made affirmative misrepresentations, as Plaintiffs contend here. *See Owens v. DRS Automotive Fantomworks, Inc.*, 764 S.E.2d 256, 260-61 (Va. 2014). But this requirement does not defeat commonality for the Virginia statewide class. In this Circuit, claims alleging fraud or misrepresentation "based on uniform misrepresentations made to all members of the class, unlike those based on individualized misrepresentations, are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *In re Amla Litig.*, 282 F. Supp. 3d 751, 759 (S.D.N.Y. 2017) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)). "[A] misrepresentation may be so fundamental to the product itself that any purchaser would necessarily rely on it." *Id.* (citing cases). Here, the misrepresentations regarding the ingredients contained in the product are fundamental to the product itself; class members purchased ADEG to achieve advertised health benefits and the ingredients in the product were fundamental to realizing those benefits. Any consumer would rely on the representation that ADEG contained 38 specific fruits and vegetables and no consumer would expect many of those ingredients to be absent from the product, only to be replaced by other, non-label ingredients. Plaintiffs will establish these uniform misrepresentations by common proof and the fact finder will determine whether Virginia class members necessarily relied on them.[17] Classwide reliance will therefore be proven with common evidence. Accordingly, commonality is also satisfied for the Virginia statewide class.

---

[17] The Virginia CPA also prohibits material omissions in a consumer transaction, Va. Code Ann § 59.1-200, and the case law is not clear whether proof of individual reliance is required when the plaintiff alleges a material omission. The material omissions here—Defendants' failure to disclose that ADEG contained non-label ingredients and may cause consumers to become physically ill—are so fundamental to the product itself that any purchaser would necessarily rely on them. *See In re Amla Litig.*, 282 F. Supp. 3d at 759. After all, what consumer would purchase a health product that contained undisclosed ingredients and could potentially cause gastrointestinal

### c. The Typicality Requirement is Satisfied.

Under Rule 23(a)(3), a representative party must assert claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied when the class representatives' claims arise from the same course of events and rely on similar legal arguments as other class members' claims. *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010); *Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 353 (E.D.N.Y. 2013). "A named plaintiff's claims need not be identical to those of the proposed class members; so long as the named plaintiff's claims share the same essential characteristics as that of the proposed class, typicality will be satisfied, even where there are 'minor variations in the fact patterns underlying individual claims.'" *Hill v. City of New York*, 136 F. Supp. 3d 304, 355 (E.D.N.Y. 2015) (quoting *Glatt v. Fox Searchlight Pictures*, 293 F.R.D. 516, 537 (S.D.N.Y. 2013)).

The proposed nationwide and statewide consumer protection act classes satisfy the typicality requirement of Rule 23(a)(3). With respect to each proposed class, the named Plaintiffs are pursuing the same claim that is pursued by all class members. The named Plaintiffs possess the same interests and suffered harm from the same conduct as did the members of the proposed classes. Each Plaintiff and member of each class purchased ADEG believing it to contain certain ingredients that would lead to advertised health benefits. Instead, each Plaintiff and member of each class purchased a product that was contaminated with non-label ingredients and also did not contain the ingredients set forth on the product label. Neither Plaintiffs nor class members were warned about the product's contents or the possible health ramifications of consuming the product.

---

distress, vomiting or bloody diarrhea? Plaintiffs' testimony in this case strongly suggest that no rational consumer would knowingly make such a purchase. (*See* Section I.H., *supra* (providing citation to Plaintiffs' sworn testimony).).

No Plaintiff or class member received the product that he or she set out to purchase. The typicality requirement is met here.

### d.     The Adequacy Requirement is Satisfied.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). For a conflict between the proposed class representative and the interests of the putative class members to defeat class certification, it must be "fundamental" and incurable; a potential conflict alone will not prevent the class from being certified. *Id.*

Here, the interests of the Plaintiffs are identical to the interests of each member of the proposed classes they seek to represent. The members of each proposed class seek to recover reimbursement damages for the wrongful conduct engaged in by Defendants. No Plaintiff's interests conflict with that of any members of the classes. Plaintiffs suffered the exact same injury as the other putative class members and their claims arise out of the same central facts relating to Defendants' production and sale of defective dietary supplement products. Moreover, Plaintiffs have engaged in discovery, produced documents, completed interrogatories, sat for depositions, and have participated actively in this litigation on behalf of all class members. Plaintiffs are thus adequate class representatives.

Rule 23(a)(4) also requires the Court to find that Plaintiffs' counsel will adequately represent the proposed class. The adequacy of class counsel depends on whether counsel (1) has investigated the class claims; (2) is experienced in handling class actions and complex litigation; (3) is knowledgeable regarding the applicable law; and (4) will commit adequate resources to

representing the class. Fed. R. Civ. P. 23(g). Undersigned counsel have ample experience in class action litigation and other complex litigation, are qualified, and have the resources to prosecute this case. (*See* Bilsborrow Decl.)

### e. The Proposed Classes Are Ascertainable.

The Second Circuit has recognized "an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobas Sec.*, 862 F.3d 250, 257 (2d Cir. 2017) (internal quotation and quotation marks omitted). This is a "modest threshold requirement [that] will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. Here, the class is defined using objective criteria; class membership encompasses only those individuals who purchased a canister of ADEG from one of the recalled lots. The identity of each such purchaser is known and knowable; indeed, in performing the product recall, NaturMed identified over 218,000 purchasers of canisters from recalled lots and sent each purchaser an individual recall letter.[18] (Ex. 19 at No. 1; Ex. 28 at JC002470; Ex. 29; *see also* Ex. 2 at 256:3-23.) NaturMed's records also indicate which of these purchasers received refunds and in what amounts. (Ex. 38 at 22-24.) Accordingly, the classes are sufficiently ascertainable.

### 2. The Consumer Protection Act Classes Satisfy Rule 23(b)(3).

---

[18] According to NaturMed, almost all sales of ADEG were direct-to-consumer sales through its call center. (Ex. 12 at No. 5.) In 2014, NaturMed distributed "a very small amount" of ADEG Fruity to retail outlets for resale, (Ex. 2 at 256:24-257:4), most of which was recovered, (Ex. 52). Although there are likely some unknown individuals who purchased ADEG Fruity from a third-party retailer, such individuals represent a small percentage of the proposed class. An adequately designed class notice will ensure any such purchasers are notified of this proceeding and provide a mechanism to determine if the ADEG that was purchased was part of the recalled lots.

Rule 23(b)(3) permits a class to seek monetary relief where "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed nationwide and statewide consumer protection act classes satisfy these requirements.

<strong>a.     The Proposed Consumer Protection Act Classes Satisfy the Predominance Requirement.</strong>

The "predominance inquiry tests whether the interests of the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Although this requirement is similar to commonality under Rule 23(a)(2), predominance is "more demanding." *Id.* at 623-24. In the Second Circuit, "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to individualized proof.'" *Roach*, 778 F.3d at 405 (quoting *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013)). In this manner, "predominance is a comparative standard; 'Rule 23(b)(3) [] does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members." *In re Petrobas Sec.*, 862 F.3d at 268 (quoting *Amgen*, 568 U.S. at 469). "[A]n issue is common to the class when it is susceptible to generalized, class-wide proof." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 227.

The Supreme Court and courts in this Circuit have "recognized that predominance is 'readily met' in cases alleging consumer fraud." *In re Hyundai & Kia Fuel Economy Litig.*, 926

F.3d 539, 558 (9th Cir. 2019) (quoting *Amchem*, 521 U.S. at 625); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118; *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 273-75 (E.D.N.Y. 2019); *In re Amla Litig.*, 282 F. Supp. 3d at 759; *In re Scotts EZ Seed*, 304 F.R.D. at 409. Such cases, like the present one, allege classwide exposure to material misrepresentations and/or uniform omissions of material information that cause substantially similar injuries within only a small range of damages; these matters present the "types of common issues, which turn on a common course of conduct by the defendant, [that] can establish predominance in nationwide [or statewide] class actions." *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d at 558.

### i. Common Issues of Fact and Law Predominate for the Nationwide GBL § 349 Class.

The proposed nationwide GBL § 349 class satisfies the predominance requirement. To prevail on this claim, which is alleged only against Bactolac, Plaintiffs must establish that Bactolac engaged in (1) "consumer-oriented conduct," that was (2) "materially misleading," and that (3) Plaintiffs suffered injury as a result. *Plavin*, 146 N.E.3d at 1167-68. Plaintiffs will prove each of these elements using common proof. After jointly formulating ADEG, Bactolac manufactured the product under a contractual obligation to adhere to the product formula. In 2014, however, Bactolac began adulterating the product, substituting ingredients and deviating from the ADEG formula. In spite of this, Bactolac certified with each batch that it utilized only the 38 fruit and vegetable ingredients required by the product formula. It affixed labels to each ADEG canister that it knew to be false, all the while fully understanding these products would be sold to purchasers, who would reasonably rely on the false label claims. Bactolac's course of behavior constitutes

consumer-oriented conduct that was materially misleading to the reasonable consumer and the evidence to prove Plaintiffs' claim is common to the class.[19]

Courts in this Circuit have found that GBL § 349 classes meet the predominance requirement where they allege a common course of conduct resulting in material misrepresentations or omissions that cause the plaintiffs economic harm. *See, e.g.*, *Sykes*, 780 F.3d at 87-92 (affirming certification of GBL § 349 damages class); *Kurtz*, 321 F.R.D. at 547-52 (explaining a GBL § 349 class alleging false labeling did not present individualized inquiries because "[t]he product was not what it said it was"); *Hasemann*, 331 F.R.D. at 273-75 (predominance satisfied in GBL § 349 class because the "objective standards—including whether the representations would likely have misled a reasonable consumer—underlying the elements of the statute[] render [it] particularly well-suited to generating common questions"); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 568-70 (S.D.N.Y. 2014) (certifying GBL § 349 class of purchasers of product falsely labeled 100% pure olive oil). Plaintiffs' proposed GBL § 349 class is consistent with these precedents and satisfies the predominance requirement.

---

[19] In its motion to dismiss, Bactolac attempted to shirk responsibility for its conduct by arguing that it did not sell ADEG to consumers. This contention is irrelevant for purposes of Plaintiffs' GBL § 349 claim. First, privity between manufacturer and purchaser is not required. *Deer Consumer Prods.*, 2012 WL 5898052, at *13. Second, the statute defines "consumer-oriented conduct" as "virtually all economic activity," which includes any conduct that has "a broader impact on consumers at large." *Plavin*, 146 N.E.3d at 1167-68 (quoting *Karlin*, 712 N.E.2d at 665, and *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 744). Bactolac's conduct here clearly constitutes "consumer-oriented conduct." Perhaps more importantly, whether Bactolac's conduct constitutes "consumer-oriented conduct" is a merits question. The answer to that question will be the same for all class members and therefore it is not the type of individualized issue that would interfere with class certification.

Similarly, the Court can apply GBL § 349 on a uniform, nationwide basis to all class members' claims without choice of law issues interfering.[20] The New York Court of Appeals has held that GBL § 349 requires that the defendant's deceptive conduct occurred in New York. *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002) The Second Circuit has called this a "transaction-based test," meaning that a court must focus on the place of the underlying transaction rather than the residency of the plaintiffs. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013). In *Cruz*, the Second Circuit found that GBL § 349 properly applied to online foreign currency exchange transactions even though some injured plaintiffs did not reside in New York; the defendant was paid in New York, required all customer communications to be sent to its New York office, and the customer agreements between the defendant broker and its customers specified that New York law governed all disputes. Accordingly, *Cruz* determined that the conduct at issue occurred, at least in part, in New York, meaning that it was governed by GBL § 349 and such claims could be raised by plaintiffs who were not New York citizens. *See id.* at 123-24; *see also Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014) (out-of-state plaintiffs could pursue GBL § 349 claims where defendant operated its website in New York and allegedly misleading communications and transactions flowed through website). Here, Bactolac's underlying misconduct—adulterating ADEG, knowingly affixing false labels to the product, falsely certifying compliance with the formula, and shipping defective ADEG to NaturMed for distribution to the consumer—occurred exclusively in New York. Accordingly, injured class members nationwide may seek recourse under GBL § 349.

---

[20] The nationwide scope of the GBL § 349 class is no barrier to certification in this Circuit. *See, e.g.*, *Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 383 (S.D.N.Y. 2019) (certifying nationwide breach of contract class).

Classwide evidence will also be used to establish damages. "At the class certification stage, the plaintiffs' burden is not to prove the element of injury, instead it is to show that class-wide injury or impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hasemann*, 331 F.R.D. at 275 (internal citations and quotations omitted); *see also Comcast Corp.*, 569 U.S. at 34 (explaining that the predominance inquiry requires plaintiffs to demonstrate that "damages are capable of measurement on a classwide basis"). According to the Second Circuit, "*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407. GBL § 349(h) permits an injured part to recover "his actual damages," and here, each class member seeks full reimbursement for the defective canisters purchased. Plaintiffs' expert, Dr. Cowan, has proffered a methodology to calculate full reimbursement damages on both a nationwide and statewide basis, thus allowing Plaintiffs to prove their entitlement to classwide damages via common proof.

Plaintiffs may pursue a full refund theory of damages on a classwide basis where they claim that the product at issue was defective in a way that rendered it ineffective or fundamentally not what was offered for sale. *See In re Scotts EZ Seed*, 304 F.R.D at 412 (plaintiffs' theory was that EZ Seed does not grow grass and is thus valueless); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014) (full refund theory available where plaintiffs alleged that over-the-counter drugs were "*entirely* ineffective"); *see also Rodriguez v. It's Just Lunch Int'l*, No. 07-cv-9227 (SHS), 2018 WL 3733944, at *4 (S.D.N.Y. Aug. 6, 2018). Here, Plaintiffs and the class sought to purchase a product that contained 38 specific fruits and vegetables and promised consumption of this mixture would provide an array of specific health benefits. Instead, Plaintiffs and the class purchased an adulterated product that conveyed none of the promised benefits and left many

purchasers seriously ill.[21] In sum, Plaintiffs will prove their entitlement to damages by classwide proof. Predominance is satisfied.

> ii. **Common Issues of Fact and Law Predominate for the Nationwide Arizona CFA Class.**

The proposed nationwide Arizona CFA class, like the GBL § 349 class, satisfies the Rule 23(b)(3) predominance requirement. The Arizona CFA permits consumers to pursue claims "based on affirmative misrepresentations, concealment, or omission of material facts." *In re Arizona Theranos, Inc. Litig.*, 256 F. Supp. 3d at 1023 (quoting *Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759, 776 (D. Ariz. 2012)). Through the presentation of common proof, Plaintiffs will establish that NaturMed and its successor, IVL2, are responsible for material misrepresentations and omissions that caused the class economic harm.

In particular, Plaintiffs will establish that NaturMed had a continuing duty to ensure its product manufacturers complied with product formulas and good manufacturing practices. In spite of this obligation, NaturMed's own employees testified that the company completely neglected to perform oversight of its product manufacturers, including Bactolac. (Ex. 6 at 39:4-11, 53:9-15.) Beginning in the fall of 2014, NaturMed began receiving a "massive uptick" in customers reporting serious gastrointestinal illness after consuming ADEG (Ex. 2 at 60:12-16.) NaturMed suspected Bactolac was adulterating the product but kept selling it anyway. Indeed, even as complaints of gastrointestinal distress, vomiting, and bloody diarrhea piled up over months, and even as NaturMed actively sought to replace Bactolac with another manufacturer, it never once revised its marketing claims or the ADEG label, and never once provided a warning to its customers that

---

[21] Even if Defendants argue the product had some benefit, and thereby dispute whether Plaintiffs will succeed on their full refund theory, that is a question for the merits stage of the proceedings; because the class will ultimately either succeed or fail on this theory, Plaintiffs' damages evidence is subject to common, classwide proof. *Rodriguez*, 2018 WL 3733944, at *4.

consumption of ADEG may cause serious physical illness. Plaintiffs will prove their Arizona CFA claim using common proof of NaturMed's misconduct and uniform material misrepresentation and omissions, which were conveyed classwide.

The Arizona CFA provides a remedy for material misrepresentations and omissions, and applies an objective test to determine whether the misrepresentation or omission would mislead "the least sophisticated" consumer. *Cheatham*, 161 F. Supp. 3d at 825-27. Thus, as with the GBL § 349 class, the Arizona CFA will entitle Plaintiffs to a class-wide inference of reliance on NaturMed's uniform material misrepresentations and omissions. *See Kurtz*, 321 F.R.D. at 547-52; *Hasemann*, 331 F.R.D. at 273-75. The Arizona CFA permits injured parties to seek reimbursement of their monies. *See* Ariz. Rev. Stat. § 44-1528. Accordingly, the nationwide Arizona CFA class will pursue full refund damages in the manner set forth above. Those damages are provable on a classwide basis.

### iii. Common Issues of Law and Fact Predominate for the Statewide Consumer Protection Act Classes.

The proposed statewide consumer protection act classes also satisfy the predominance requirement of Rule 23(b)(3) for many of the reasons that counsel certification of the nationwide GBL § 349 and Arizona CFA claims. The statewide classes will rely on common proof of Defendants' tortious conduct and uniform material misrepresentations and omissions made to the entire class. As set forth above in the commonality analysis, with the exception of Virginia, the consumer protection acts pursued by each proposed statewide class apply an objective test to determine whether a reasonable consumer would rely on the misrepresentation or omission. Thus, as with the GBL § 349 class and the Arizona CFA class, Plaintiffs will present classwide evidence that establishes the materiality of Defendants' misrepresentations and omissions and class members' reasonableness in relying on those misrepresentations and omissions; common evidence

of material misrepresentations and omissions regularly satisfies the predominance requirement in this Circuit in classes alleging consumer fraud. *See, e.g.*, *Sykes*, 780 F.3d at 87-92; *Kurtz*, 321 F.R.D. at 547-52; *Hasemann*, 331 F.R.D. at 273-75. Indeed, consumer classes seeking recourse for material misrepresentations and omissions under the state statutes pled here have been frequently certified by courts nationwide. *See, e.g.*, *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 502 (6th Cir. 2015) (affirming statewide classes under California, Florida, Illinois, New Hampshire, and North Carolina law); *Hasemann*, 331 F.R.D. at 273-75 (certifying classes under GBL § 349 and Florida Deceptive and Unfair Trade Practices Act); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018) (certifying class of purchasers under California unfair competition and false advertising law who claimed "made with real ginger" labels were materially misleading); *In re ConAgra Foods*, 90 F. Supp. at 919, 982-83, 992-93, 995-99, 1012-13, 1016-17 (certifying classes under consumer protection statutes of California, Florida, Illinois, Oregon, and Texas met the predominance requirement in consumer class alleging "100% Natural" label was material misleading).

The Virginia statewide class also meets the predominance requirement under the facts of this case. Although proof of individual reliance is required under the Virginia Consumer Protection Act, courts in this Circuit have explained that a uniform misrepresentation or omission "may be so fundamental to the product itself that any purchaser would necessarily rely on it." *In re Amla Litig.*, 282 F. Supp. 3d at 760; *see also Ebin*, 297 F.R.D. at 569 (product sold as "100% pure olive oil" was allegedly 0% olive oil). The misrepresentations and omissions here are similarly fundamental; ADEG purported to be a health supplement that consisted of 38 specific fruits and vegetables, but this was false; ADEG contained numerous non-label ingredients, none of which were conveyed to its potential purchasers. Some of these ingredients were allergens, irritants, weeds or worse. What

is more, no member of the Virginia class was warned that ADEG may cause serious illness. As proposed Virginia statewide class representative Charles Copley testified, he never would have consumed ADEG had he been provided such a warning. (*See* Ex. 45 at 146:4-7.) All Virginia class members would reasonably have acted similarly.

Full reimbursement, or "actual damages, are available under the consumer protection laws pursued by the proposed statewide classes, just as those damages are available under GBL § 349 and the Arizona CFA. *See, e.g.*, *Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-709-CAB-RBB, 2017 WL 1020391, at *6-7 (N.D. Cal. Mar. 16, 2017) (permitting full reimbursement under California's unfair competition and false advertising law); *Rollins, Inc. v. Heller*, 454 So.2d 580, 584-85 (Fla. Dist. Ct. App. 1984) (permitting full reimbursement under Florida Deceptive and Unfair Trade Practices Act); *Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2017 WL 3704206, at *5-7 (S.D. Ill. Aug. 28, 2017) (full refund damages available under Illinois Consumer Fraud Act); *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714-15 (Mo. Ct. App. 2009) (permitting recovery for any "ascertainable loss" under the Missouri Merchandising Practices Act); *Pearson v. Philip Morris, Inc.*, 306 P.3d 665 (Ore. 2013) (any ascertainable loss actionable under Oregon Unfair Trade Practices Act); *Daisy Outdoor Advertising Co., Inc. v. Abbott*, 473 S.E.2d 47, 49 (S.C. 1996) (permitting recovery under South Carolina Unfair Trade Practices Act). Dr. Cowan's report demonstrates that full reimbursement damages are calculable on a state-by-state, as well as nationwide, basis. (Ex. 38 at 11-21.) Accordingly, the statewide classes will prove common damages using the same or substantially similar proof that will be relied upon by the GBL § 349 and Arizona CFA classes.

In sum, with regard to each of the proposed statewide classes, "common questions *predominate* over any questions affecting only individual [class] members." *In re Petrobas Sec.*,

862 F.3d at 268 (quoting *Amgen*, 568 U.S. at 469). Common proof will establish Defendants' liability under each respective state's consumer protection act, as well as Plaintiffs' entitlement to full reimbursement damages. This is the paradigmatic consumer fraud case of which both the Supreme Court and courts of appeal have "recognized that predominance is 'readily met.'" *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d at 558 (quoting *Amchem*, 521 U.S. at 625).

> **b.      The Proposed Consumer Protection Act Classes Satisfy the Superiority Requirement.**

Rule 23(b)(3) requires that a class action proceeding "is superior to other available means for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Second Circuit has explained that the superiority analysis "is explicitly comparative in nature," *In re Petrobas Sec.*, 862 F.3d at 268, and directs the court to compare the efficiencies of the class action device to "other available methods of *adjudication*." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 415 (emphasis in original). "[C]lass actions are superior to individual trials 'when the main objectives of Rule 23 are served,' including 'the efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications.'" *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014) (quoting *D'Alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996)).

Rule 23(b)(3) lists four factors the court should consider in making the superiority determination: class members' interests in individually controlling the litigation, prior actions involving the parties, the desirability of the forum, and difficulties in managing the case. *Sykes*, 780 F.3d at 82. Where each class member's potential recovery would not be sufficient to incentivize an individual action, a class action is superior to individual suits. *See Amchem*, 521 U.S. at 617 (explaining that the "policy at the very core of the class action mechanism is to

overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" (internal quotation omitted)). Further, although the Court must analyze trial manageability concerns, the Second Circuit has offered "the admonition that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobas Sec.*, 862 F.3d at 268 (internal quotation and quotation marks omitted)). "[M]anageability is an issue peculiarly within a district court's discretion." *Seijas v. Rep. of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

A class action is clearly superior to other means of adjudication in this case. Class members' claims—for full reimbursement of the monies spent on defective ADEG—is precisely the sort of "small recovery" referred to by the Supreme Court that is unlikely to incentivize individual suits. *See Amchem*, 521 U.S. at 617. Given the cost-prohibitive nature of individually litigating a reimbursement claim against three defendants, the likely alternative to class adjudication here is no adjudication at all, leaving tens of thousands of harmed ADEG purchasers without a viable means of pursuing their claims. Resolving these claims in a single action will avoid the potential for inconsistent results, decrease the expenses of litigation, and will promote judicial economy. Finally, class treatment is manageable. The proposed classes are comprised of a well-defined group of purchasers who have already been identified by NaturMed when it conducted its product recall. Further, because Plaintiffs pursue consumer protection claims that require similar showings and which largely apply a test of objective reasonableness, they will rely to establish Defendants' liability. A class trial can be managed without undue burden or complexity. In short, a class action is a superior method for fairly and efficiently adjudicating class members' claims.

Accordingly, Plaintiffs respectfully request that the Court certify the proposed nationwide and statewide classes proceeding under state-law consumer protection act statutes pursuant to Federal Rule of Civil Procedure 23(b)(3).

### C. The Court Should Certify the Proposed Statewide Classes Alleging Fraudulent Concealment Under State Common Law.

Plaintiffs move for certification of statewide classes asserting common law fraudulent concealment claims against Defendants under the laws of the following states: Arizona, California, Florida, Illinois, Kentucky, Missouri, New York, Oregon, South Carolina, Texas, Virginia, Washington, and Wisconsin. Much of the analysis set forth above is equally applicable to the proposed statewide fraudulent concealment classes. Accordingly, Plaintiffs do not repeat the Rule 23(a) numerosity, typicality, and adequacy analysis, or the Rule 23(b)(3) superiority analysis. Plaintiffs focus below on the commonality and predominance requirements of Rule 23(a)(2) and Rule 23(b)(3).

"The basic elements of fraudulent misrepresentation are the same across jurisdictions. The plaintiff must show (1) that the defendant made a material misrepresentation, with (2) scienter (i.e., intent to defraud), and (3) that the plaintiff relied on the misrepresentation to her detriment (i.e., she suffered an injury proximately caused by the misrepresentation)." *In re Amla Litig.*, 282 F. Supp. 3d at 759; *see also Lovejoy v. AT&T Corp.*, 14 Cal. Rptr. 3d 117, 121 (Cal. Ct. App. 2004) (setting forth elements for fraudulent concealment under California law, which in addition to the elements above, requires that defendant was under a duty to disclose); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So.3d 1060, 1068-69 (Fla. Dist. Ct. App. 2010) (setting forth elements of fraudulent concealment claim in Florida, which requires that the defendant acted in bad faith and was under a duty to disclose); *Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. Ct. 2010) (setting forth elements under Illinois law); *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747

(Ky. 2011) (setting forth elements under Kentucky law, which also requires a duty to disclose); *Schwatka v. Super Millwork, Inc.*, 106 A.D.3d 897, 900 (N.Y. App. Div. 2013) (under New York law, a plaintiff "must allege that the defendant knowingly misrepresented or concealed a material fact for the purpose of inducing another party to rely upon it, and that the other party justifiably relied upon such misrepresentation or concealment to his or her own detriment."); *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *5 (E.D. Wis. July 1, 2019) (setting forth elements under Wisconsin law, which includes a duty to disclose).

As set forth above, the "Second Circuit has held that 'fraud claims based on uniform misrepresentations made to all members of the class,' unlike those based on individualized misrepresentations,' are 'appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.'" *In re Amla Litig.*, 282 F. Supp. 3d at 759 (quoting *Moore*, 306 F.3d at 1253, and citing *In re U.S. Foodservice Pricing Litig.*, 729 F.3d at 118). In the *Amla Litigation*, the court held that although the defendant's misrepresentations were subject to common, classwide proof, the reliance element of the fraudulent concealment claim would require individual inquiries, thus overwhelming the common issues. *Id.* at 760. The product at issue—a hair relaxer—did what it was supposed to do, it just caused burns and injuries to the plaintiffs' scalp while doing so. *Id.* at 760. The court noted, however, that certification of fraudulent concealment claims may be appropriate "if the plaintiffs can prove reliance 'through common evidence.'" *Id.* at 760 (quoting *In re U.S. Foodservice*, 729 F.3d at 120). Courts in this Circuit have held that "a misrepresentation may be so fundamental to the product itself that any purchaser would necessarily rely on it." *Id.* For example, in *Ebin v. Kangadis*, 297 F.R.D. at 569, the defendant labeled its product as "100% pure olive oil" but it was allegedly 0% olive oil; in

*Hart v. BHH, LLC*, No. 15-cv-4804, 2017 WL 2912519, at *8 (S.D.N.Y. July 7, 2017), the defendant marketed a pest repellent that allegedly did not repel any pests.

In these cases, because the misrepresentation was so fundamental to the product, reliance could be proven on a classwide basis using common proof. So too here. Defendants marketed ADEG as a health supplement containing certain ingredients that would result in certain specific health benefits. The product sold to consumers did not contain those ingredients and instead contained other, non-disclosed ingredients of varying degrees of concern. No consumer received the product he or she bargained for and, in many cases, consumers became ill, some seriously so. In the best case scenario, the product simply did not work. The misrepresentations were so fundamental to ADEG itself that any consumer purchasing the health supplement would necessarily have relied on them.

Accordingly, common issues of fact and law predominate in each of the statewide fraudulent concealment classes. The essential elements of the claim—a material misrepresentation, reliance, and scienter—all are susceptible to classwide proof. Furthermore, in jurisdictions that require the plaintiff to establish a duty to disclose, such a showing will also take the form of common proof and will either be established for all statewide class members or none. In other words, under the facts of this case, Plaintiffs' proposed statewide fraudulent concealment classes meet the requirements of Rule 23(a) and Rule 23(b)(3) and merit certification.

### D.    The Court Should Certify the Statewide Unjust Enrichment Classes.

Plaintiffs move for certification of statewide classes alleging claims for unjust enrichment against all Defendants under the laws of Arizona, California, Florida, Illinois, Missouri, New York, Oregon, South Carolina, Virginia, and Wisconsin. In addition, Plaintiffs move for certification of statewide classes alleging unjust enrichment claims against NaturMed and IVL2 under the laws of

Kentucky and Washington. Claims for unjust enrichment in these groupings require similar elements that may be established using common proof. Because many of the Rule 23(a) and 23(b)(3) elements required to certify the unjust enrichment classes mirror the analysis set forth above, Plaintiffs focus here on the requirements that common issues of fact and law predominate among these cohesive statewide classes.

To prevail on an unjust enrichment claim in each of the states at issue, Plaintiffs must establish that they conferred a benefit on Defendants at Plaintiffs' expense and that equity and good conscience require restitution. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (setting forth elements under New York law); *Stapley v. Am. Bathtub Liners, Inc.*, 785 P.2d 84, 88 (Ariz. Ct. App. 1989) (Arizona law); *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 675 (Cal. 2011) (California law[22]); *James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms, Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011) (Florida law); *Kenneke v. First Nat'l Bank of Chicago*, 382 N.E.2d 309, 310-11 (Ill. App. Ct. 1978) (Illinois law); *Guerin v. Fulkerson*, 354 S.W.3d 161, 165 (Ky. Ct. App. 2011) (Kentucky law); *Renaissance Academy for Math v. Imagine Schools, Inc.*, No. 4:13-CV-00645-NKL, 2014 WL 12606148, at *3 (W.D. Mo. Feb. 10, 2014) (Missouri law); *Winters v. Cnty. of Clastop*, 150 P.3d 1104, 1106 (Ore. Ct. App. 2007) (Oregon law); *Martin v. JTH Tax, Inc.*, 2013 WL 1282224, at *7 (D.S.C. Mar. 27, 2013) (South Carolina law); *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020) (Virginia law); *Lynch v. Deaconess Med. Ctr.*, 776 P.2d 681, 683 (Wash. 1989) (Washington law); *Puttkammer v. Minth*, 266 N.W.2d 361, 363 (Wis. 1978) (Wisconsin law).

---

[22] In California, there is no stand-alone claim for unjust enrichment, but California courts construe a claim for unjust enrichment "as a quasi-contract claim seeking restitution," which requires the same elements as an unjust enrichment claim in other jurisdictions. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)

Here, Plaintiffs contend that Defendants obtained money for a product that was defective and not what it purported to be. Defendants were enriched at Plaintiffs' expense and, as Plaintiffs have no remedy in contract, equity is available to provide restitution for this improper enrichment. In Arizona, California, Florida, Illinois, Missouri, New York, Oregon, South Carolina, Virginia, and Wisconsin, Plaintiffs pursue unjust enrichment claims against Defendants collectively, for Defendants have collectively been unfairly enriched at Plaintiffs' expense. In these jurisdictions, privity is not required and the law permits consumers to raise unjust enrichment claims against both the immediate seller and manufacturer of defective or mislabeled products. *See See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1089 (S.D. Cal. 2017) (Arizona law); *Hartford Casualty Ins. Co. v. J.R. Mktg., LLC*, 353 P.3d 319, 326 (Cal. 2015) (California law); *Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) (Florida law); *Muehlbauer v. Gen. Motors Corp.*, 431 F. Supp. 2d 847, 853 (N.D. Ill. 2006) (Illinois law); *Renaissance Academy for Math*, 2014 WL 12606148, at *3 (Missouri law); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) (New York law[23]); *Rosenblum v. First State Bank of Elgin*, 581 P.2d 515, 518-19 (Ore. 1978) (Oregon law); *See In re Auto. Parts Antitrust Litig. (Occupational Safety Sys.)*, 50 F. Supp. 3d 869, 896-97 (E.D. Mich. 2014) (South Carolina law); *James G. Davis Constr. Corp.*, 841 S.E.2d at 647 (Virginia law); *Puttkammer v. Minth*, 266 N.W.2d 361, 366 (Wis. 1978) (Wisconsin law). Accordingly, there are no individual issues related to privity that will threaten to overwhelm the common issues that predominate among these statewide classes.

---

[23] New York courts will not permit an unjust enrichment claim where the relationship between the plaintiff and defendant is "too attenuated," *Mandarin Trading Ltd.*, 944 N.E.2d at 1111, "but an end-customer has a sufficiently direct relationship with a manufacturer" to pursue such a claim under New York law, *In re Amla Litig.*, 282 F. Supp. 3d at 766; *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010).

Unjust enrichment claims under Kentucky and Washington law require privity between the purchaser of a product and its seller. *See Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 973-74 (E.D. Ky. 2019) (Kentucky law); *See, e.g.*, *Nat'l Sur. Corp. v. Immunex Corp.*, 256 P.3d 439 (Wash. 2011). The Kentucky and Washington classes therefore pursue their unjust enrichment claims only against NaturMed and IVL2 as its successor.[24]

The finder of fact can answer the question whether Defendants were unjustly enriched on a classwide basis. For this reason, courts in the Second Circuit regularly certify statewide unjust enrichment classes. *See In re Amla Litig.*, 282 F. Supp. 3d at 766-67 (certifying statewide unjust enrichment classes under Florida and New York law); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147-48 (S.D.N.Y. 2014) (certifying unjust enrichment class under New York law); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009) (certifying New York unjust enrichment class and explaining the "predominant issue for the unjust enrichment claim is whether [the defendant] was enriched at the class' expense"); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46 (E.D.N.Y. 2008) (certifying New York unjust enrichment class). This Court should follow these authorities and certify the proposed statewide unjust enrichment classes.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court certify the proposed nationwide and statewide classes, appoint Plaintiffs as representatives of those classes, appoint the undersigned as counsel for the classes, and grant all other such relief as the Court finds just and proper.

Dated: September 22, 2020
     New York, New York

                                      /s/ James J. Bilsborrow
                                      James J. Bilsborrow
                                      Katherine Hansson

---

[24] Plaintiffs do not seek to certify a statewide unjust enrichment class under Texas law.

WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
Fax: (212) 344-5461
jbilsborrow@weitzlux.com
khansson@weitzlux.com

*Attorneys for Plaintiffs and Proposed Classes*