UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
CHARLES COPLEY, *et al*.,
Individually and on behalf of all others
similarly situated,

                Plaintiffs,

     -against-

BACTOLAC PHARMACEUTICAL,
INC., *et al*.,

                Defendants.
--------------------------------------------------x
JEFFREY FARIS, *et al*.,
Individually and on behalf of all others
similarly situated,

                Plaintiffs,

     -against-

BACTOLAC PHARMACEUTICAL,
INC., *et al*.,

                Defendants.
--------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 2:18-CV-00575-FB-PK
Case No. 2:20-CV-01338-FB-PK

*Appearances:*
*For the Plaintiffs*:
JAMES J. BILSBORROW
Weitz & Luxenberg, PC
700 Broadway
New York, NY 10003

PETER SAMBERG
Weitz & Luxenberg, PC
100 Ardsley Avenue West
Ardsley on Hudson, NY 10503

*For Defendant Bactolac*:
ANDREW PHILIP KATES
CHRISTIAN H. GANNON
JANINE J. WONG
JOEL MERCHANT
MATTHEW D. KELLY
Segal McCambridge Singer &
Mahoney
850 Third Avenue, Suite 1100
New York, NY 10022

1

*Interested Party*:
BREON PEACE
United States Attorney's Office
By: MELANIE M. SPEIGHT
Eastern District of New York
271A Cadman Plaza East
Brooklyn, NY 11201

CAMERON W. BROWN
Stackpole and French Law Office
225 Maple Street
Stowe, VT 05672

HOWARD A. FRIED
McGivney Kluger Clark & Intoccia, P.C.
80 Broad Street, 23rd Floor
New York, NY 10004

*For Defendant NaturMed*:
KAREN CAMPBELL
Lewis Brisbois
77 Water Street, 21st Floor
New York, NY 10005

SHEILA CARMODY
COURTNEY HENSON
JENNIFER HADLEY CATERO
Snell and Wilmer L.L.P.
400 East Van Buren Street
Suite 1900
Phoenix, AZ 85004

JOHN A. ANSELMO
Tyson & Mendes
420 Lexington Avenue, Suite 2800
New York, NY 10017

*For Defendant Independent Vital Life*:
ANTHONY AUSTIN
JUSTIN R. DEPAUL
2394 E. Camelback Road
Suite 600
Phoenix, AZ 85016

JOSEPH J. ORTEGO
MARISSA A. MUSCARELLA
MATTHEW FORZANO
SANTO BARRUSO
Nixon Peabody LLP
275 Broadhollow Road, Suite 300
Melville, NY 11747

**BLOCK, Senior District Judge:**

This putative multi-state class action stems from harm allegedly suffered by plaintiffs who purchased and consumed All Day Energy Greens ("ADEG"), a dietary supplement that they claim caused them to become ill. After years of litigation and settlement negotiations aided by a mediator, the parties have reached a proposed class settlement (the "Settlement"). Now, the parties seek the Court's final approval of that Settlement. For the reasons that follow, plaintiffs' motion to approve the Settlement is granted in all respects except as to proposed attorneys' fees.

## I.    OVERVIEW

The Court granted preliminary approval of the Settlement on January 10, 2022. The Settlement dictates that eligible class members who opt in may elect to receive either (i) a coupon worth $10 toward the future purchase of any of the Defendants' products, redeemable for a period of three years, or (ii) a cash payment, which is projected to be approximately $15.85. Separately, the class representatives are to receive service awards of $5,000 each. Class counsel have also moved for a payout of $1,194,657.34 in attorneys' fees and costs.

Through the Department of Justice's ("DOJ") Consumer Protection Branch and the United States Attorney's Office for the Eastern District of New York (E.D.N.Y.), the United States (the "U.S.") has objected to the Settlement. It argues

that it is unfair for two reasons: (i) because it primarily benefits class counsel instead of class members, and (ii) because the representatives of the class will receive disproportionate awards compared to the rest of the class members.

In the analysis that follows, the Court lays out its findings that the Settlement, including the service awards, is procedurally and substantively fair and reasonable in accordance with Rule 23(e)(2). However, the Court rejects the proposed attorneys' fee award.

## II.    FACTS AND PROCEDURAL HISTORY

Defendants are NaturMed, Inc. d/b/a Institute for Vibrant Living ("NaturMed"), the company that designed, marketed, distributed and sold ADEG, Independent Vital Life, LLC ("IVL"), the alleged successor-in-interest of NaturMed, and Bactolac Pharmaceutical, Inc. ("Bactolac"), the company that blended and packaged ADEG pursuant to its contract with NaturMed (collectively, the "Defendants"). The class representatives ("Class Representatives")[1] brought suit individually and on behalf of all others similarly situated (collectively,

---

[1] The Class Representatives are the named plaintiffs: Charles Copley, Jason Evans, Humberto Garcia, Luz Angelina Garcia, Joan McDonald, John Peterson, Natalie Roberts, Donald Skare, individually and as personal representative for Betty Skare, David Stone, Kaye Wink, individually and as next of kin of Donald Wink, Jeffrey Faris, Antonia Hampton, Raul Robles, and Kathleen Cannon. On July 13, 2020, the Court granted a consent motion to consolidate *Faris v. Bactolac Pharmaceutical, Inc.*, No. 20-CV-1338 (FB)(PK) with this case. The Class Representatives include the named plaintiffs from both cases.

"Plaintiffs") alleging that Defendants engaged in false, misleading, and deceptive marketing of ADEG. According to Plaintiffs, Defendants' representations of ADEG as an all-natural product that would naturally increase energy and support digestion were "a sham." Am. Compl. ¶ 2. In addition, Plaintiffs allege that ADEG "consisted of a dangerous mixture that resulted in serious illness and/or death among those who consumed it." *Id.*

Plaintiffs claim that in 2014, NaturMed became aware that ADEG was making customers sick with gastrointestinal distress. After these reports surfaced, NaturMed inquired with Bactolac about possible contamination of the product. When Bactolac did not cooperate fully with NaturMed's request for information, NaturMed switched to a new manufacturer in July 2015. In March 2016, Defendants recalled ADEG canisters that were sold during a specified period from 2014 to 2016. Plaintiffs contend that Defendants failed to timely warn consumers of the products' harmful effects and issue a timely recall. Plaintiffs also find fault with the 2016 recall, alleging that NaturMed attempted to downplay the potential for danger posed by its product, which contained ingredients that were not on the label.

The Class Representatives are purchasers of canisters of ADEG from the recalled lot who allegedly became ill after consuming the product, some so

seriously that they required hospitalization. The class that they seek to represent is made up of purchasers of ADEG from the 2016 recalled lot.

In 2017, IVL purchased NaturMed after the company fell into financial distress, apparently because of the recall and personal injury and wrongful death lawsuits stemming from the contaminated product, as well as a defaulted-upon loan from its secured lender. Plaintiffs allege that IVL is the "same legal person" as NaturMed. Am Compl. ¶ 29.

On January 26, 2018, Plaintiffs filed this action asserting numerous claims stemming from the aforementioned harm. Roughly six months later, Plaintiffs amended their complaint, and NaturMed answered with crossclaims against Bactolac. In Plaintiffs' Amended Complaint, they alleged claims on behalf of a nationwide class, which is defined as individuals who purchased canisters of ADEG from July 1, 2014 to the present that were manufactured and/or blended by Bactolac between January 1, 2014 and December 31, 2015. Plaintiffs also have initiated comparable statewide claims in ten states.[2] The Court has jurisdiction over those claims under the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d).

After discovery, Bactolac moved to dismiss the Plaintiffs' claims and for judgment on the pleadings with respect to NaturMed's crossclaims, as well as to

---

[2] These states are Alabama, California, Illinois, Kentucky, Missouri, Oregon, South Carolina, Texas, Virginia, and Wisconsin.

strike Plaintiffs' request for punitive damages. On March 10, 2021, the Court denied Bactolac's motion to strike, and granted in part and denied in part its motions to dismiss and for judgment on the pleadings. Plaintiffs separately withdrew several claims. Fifteen of Plaintiffs' claims and four of NaturMed's crossclaims survived. Shortly thereafter, the Court referred the parties to mediation.

With the help of the mediator and after months of negotiations, the parties were able to reach an agreement (the "Settlement Agreement"). On January 10, 2022, the parties filed for preliminary approval of the Settlement Agreement, and the Court granted it. A final fairness hearing was scheduled for May 19, 2022 (the "Fairness Hearing"), and notice was served to potential class members according to the notice plan defined by the Settlement Agreement. On April 29, 2022, Plaintiffs' counsel notified the Court that they had received only a single objection to the Settlement Agreement.

One day before the Fairness Hearing, the U.S. filed a statement of interest (the "Statement of Interest") objecting to the Settlement. Plaintiffs then moved to strike the Statement of Interest. At the Fairness Hearing, the terms of the Settlement and the two objections were discussed at length. Following the Fairness Hearing, the U.S. moved to supplement its Statement of Interest.

The Court must now decide whether to grant final approval of the Settlement Agreement, and in turn resolve the two motions that are incidental to that decision.

## III.   LEGAL STANDARD

Claims brought by a proposed class may only be settled with approval from a district court. Fed. R. Civ. P. 23(e)(2). In addition, special consideration is due when reviewing settlements that include coupons to be paid out to class members, as is the case here.

In 2005, Congress enacted CAFA to reform how class actions are adjudicated. Specifically, CAFA offers protections to class members from predatory practices that are sometimes engaged in by class counsel and the parties to those actions. Relevant to this case is CAFA's treatment of coupon settlements. Generally, coupon settlements are disfavored under CAFA. *See Berkson v. Gogo LLC*, 147 F. Supp. 3d 123, 132 (E.D.N.Y. 2015) (noting that coupon settlements "'have been severely criticized by commentators in the field . . . [and] are strongly disfavored by the Attorneys General of most of the states'" (quoting *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d, 1292, 1321 (S.D. Fla. 2001))). While drafting CAFA, Congress voiced its disapproval of "[a]busive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees." S. Rep. No. 109-14, 2005 WL 627977 at 32 (2005).

Coupon settlements often fail to provide meaningful benefits to eligible class members, since they require the class members to do future business with a company that ostensibly harmed them. In turn, these settlements grant defendants the benefit of potential future business, while failing to disgorge them of the gains from their harmful actions that gave rise to the suit in the first place. *See Berkson*, 147 F. Supp. at 132 (noting that coupon settlements "'may offer scant compensation, [are] unlikely to disgorge or deter, and compel a class to continue its relationship with an alleged wrong-doer'" (quoting 4 William B. Rubenstein, Newberg on Class Actions § 12:8 (5th ed. 2015))).

As a result, settlements embracing coupons are considered "a warning sign of a questionable settlement" and require courts to apply a greater level of scrutiny. *Id*. To achieve this greater level of scrutiny, CAFA spelled out a list of factors that courts must consider when assessing the fairness of a coupon settlement, which, as explained below*,* are now incorporated into Rule 23(e)(2).

There is no dispute that this settlement is a coupon settlement under CAFA, since it provides eligible class members with the option to receive a voucher toward the future purchase of an IVL product, or alternatively a cash payment.

**a. The Fairness Assessment:**

Federal Rule of Civil Procedure 23(e)(2) provides that to approve a proposed class settlement that would bind potential class members, a Court must (i) conduct

a hearing, and (ii) find that the settlement is fair, reasonable and adequate. In

determining the second prong, a court may grant approval only after considering

whether:

> (A)   the class representatives and class counsel have adequately
>        represented the class;
> (B)   the proposal was negotiated at arm's length;
> (C)   the relief provided for the class is adequate, taking into
>        account:
>        i.   the costs, risks, and delay of trial and appeal;
>        ii.  the effectiveness of any proposed method of distributing
>             relief to the class, including the method of processing class-
>             member claims;
>        iii. the terms of any proposed award of attorney's fees,
>             including the timing of payment; and
>        iv.  any agreement required to be identified under Rule 23(e)(3);
>             and
> (D)   the proposal treats class members equitably relative to each
>        other.

Fed. R. Civ. P. 23(e)(2). This analysis incorporates the need for district courts to

find both procedural and substantive fairness. *See McReynolds v. Richards-*

*Cantave*, 588 F.3d 790, 803-804 (2d Cir. 2009) ("In determining whether a

settlement is fair, reasonable, and adequate, the District court examines the

'negotiating process leading up to the settlement [, *i.e.*, procedural fairness,] as

well as the settlement's substantive terms [, *i.e.*, substantive fairness.]'" (quoting

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2002) (alterations in

original)).

Procedural fairness is addressed by the first two prongs of Rule 23(e)(2). In assessing the process in which a settlement was reached, a "'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting Manual for Complex Litig. (Third) § 30.42 (1995)). Reaching a settlement with the help of a mediator may also trigger a presumption of procedural fairness. *See McLaughlin v. IDT Energy*, No. 14-cv4107(ENV)(RML), 2018 WL 3642627, at *9-10 (E.D.N.Y. July 30, 2018).

To assess the final two prongs of Rule 23(e)(2), which address the substantive fairness of the settlement, courts in the Second Circuit turn to the *Grinnell* factors set forth in *City of Detroit v. Grinnell Corporation*:

(1)  the complexity, expense and likely duration of the litigation;
(2)  the reaction of the class to the settlement;
(3)  the stage of the proceedings and the amount of discovery completed;
(4)  the risks of establishing liability;
(5)  the risks of establishing damages;
(6)  the risks of maintaining the class action through the trial;
(7)  the ability of the defendants to withstand a greater judgment;
(8)  the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
(9)  the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (abrogated on other grounds by *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)). These

11

factors are to be considered under the totality of the circumstances and none alone is dispositive. *See Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("All nine factors need not be satisfied, rather, the court should consider the totality of these factors in light of the particular circumstances.").

### b. Service Awards to Class Representatives

Service awards to class representatives are subject to a separate analysis. When considering whether the proposed awards to the Class Representatives are appropriate, as required under Rule 23(e)(2)(D), courts should consider:

> the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery.

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997). This analysis may or may not justify an award to class representatives that is greater than that offered to eligible class members.

### c. Attorneys' Fee Award:

Separately, approval of a class-action settlement requires an assessment of "any proposed award of attorney's fees." Fed. R. Civ. P.

23(e)(2)(C)(iii). As explained below, district courts are invariably challenged in determining an appropriate fee award when, as here, the Settlement Award is a mixture of cash and coupons.

## IV.  THE PROPOSED SETTLEMENT

The Settlement defines the proposed class as "all Persons in the United States who purchased one or more canisters of ADEG that were manufactured as part of the Recalled Lots, except for Excluded Persons." Mot. for Prelim. Approval of Class Settlement, at Ex. 1 ¶ 1(aaa). Plaintiffs estimate that the proposed class consists of approximately 188,897 individuals.

In order to satisfy the awards to class members, Defendants have agreed to the following distributions:

i)  IVL will give a $10 coupon to any class member entitled to one, up to the estimated class size, and

ii)  Defendants will transfer $1.725 million in cash into a common settlement fund (the "Settlement Fund").

The Settlement Fund consists of:

i)  $100,000 designated to satisfy the cash payments to class members who selected this option, and

ii)  $1.625 million designated for attorneys' fees and costs, service benefit awards of $5,000 for each of the Class Representatives, and additional administrative costs.

As of May 18, 2022, which was two days before the final deadline to opt into the Settlement, 10,373 of the 188,897 eligible class members had filed a claim.

13

Of those, 6,136 opted for a cash payment, 1,698 opted for a coupon, and 2,539 failed to make a selection. The terms of the Settlement dictate that those class members who fail to select their preferred compensation method will receive a coupon. Only one eligible class member opted out of the Settlement.

The Settlement Agreement dictates that the entire $100,000 portion of the Fund must be distributed pro rata to the claimants who elected cash awards. The award to each claimant was initially estimated to be $5; however, because fewer class members than expected claimed the cash option, each will now receive approximately $15.85. Had more class members claimed a cash award than would have allowed for a $5 payment to each, they would have received pro rata payments of less than $5. To note, one canister of ADEG costs $39.95.

According to the Settlement Agreement, class counsel may seek an attorneys' fee award of up to one-third of the total Settlement value and costs of up to $210,136.30. Plaintiffs calculate one-third of the Settlement value to be $1,207,019. Their calculation assigns $1,888,970 to the coupon portion of the Settlement on the assumption that all 188,897 class members would receive a $10 coupon and redeem that coupon.

That assumption has been proven false. Only 4,237 class members will receive coupons. At a face value of $10 per coupon, this portion of the class will receive *at most* a benefit of $42,370. The value is almost certain to be much lower

14

once the coupons are distributed, since realistically many recipients may not redeem their coupons.

In sum, the Settlement contemplates a maximum out-of-pocket cost to Defendants of $1.725 million, with $100,000 in cash, plus the service benefit awards being distributed to class members and the remainder allotted for attorneys' fees, costs, and administrative expenses. Defendants will also incur an indirect cost associated with redeemed coupons. That cost (and corresponding benefit to the class) is of uncertain value but will be no greater than $42,370.

### a. Objection to Class Settlement by Individual

At the Fairness Hearing, one individual raised an objection to the Settlement. That individual, James Henson ("Henson"), argues that he should be paid from the Settlement Fund the $57,313 he is owed by NaturMed resulting from a default judgment he obtained against the company in the District of Maryland. Henson's objection is not grounded in applicable law. Instead, he seeks a means of recovery that does not apply and fails to support his argument with any caselaw. His default judgment was awarded as a result of personal injuries sustained, which are not covered by the Settlement nor the surviving claims against the Defendants. Accordingly, this is not the proper avenue for Henson to recover his judgment and his objection is denied.

15

### b. Statement of Interest of the United States

The "Statement of Interest" objection filed by the U.S. is more substantial. The Attorney General of the U.S. may send any officer of the DOJ to any district or state court to "attend to the interests of the United States" in a pending action. 28 U.S.C. § 517. Under CAFA, defendants are required to notify the Attorney General and the appropriate state officials of proposed class action settlements to ensure consumer protection.

In this case, the U.S. objected to the Settlement on the basis that it is unfair and unreasonable under Rule 23(e)(2) because (i) it directs most of the benefit to class counsel instead of to class members, and (ii) the Class Representatives will receive a much greater financial benefit than the rest of the class members.

## V. ANALYSIS

Before analyzing the fairness and reasonableness of the Settlement, the Court first addresses the pending motions that are incidental to the disposition of the Plaintiffs' motion for final approval.

### a.  Plaintiffs' Motion to Strike

Plaintiffs argue that the U.S.'s Statement of Interest, which it filed one day prior to the Fairness Hearing, was untimely. They argue that they were unfairly prejudiced by the late date of the filing, since they were deprived of the

opportunity to properly respond, and that as a result the Court should strike the filing.

Objections to the Settlement were due on April 11, 2022. There is some discrepancy about when notice of the Settlement Agreement was served on the U.S. However, no reasonable person could disagree that the filing of an objection the day before the Fairness Hearing gave Plaintiffs' counsel little time to respond. That said, the Court prefers to deal with the merits of the U.S.'s Statement of Interest. Plaintiffs ultimately were able to file a response, which the Court has duly considered. The parties' positions were also discussed at length at the Fairness Hearing. Therefore, the Court finds that Plaintiffs were not prejudiced by the late hour at which the Statement of Interest was filed. Accordingly, the motion to strike is denied.

**b. The U.S.'s Motion to Supplement**

On May 25, 2022, the U.S. followed up its Statement of Interest with a motion to supplement, which Plaintiffs opposed. With this supplemental briefing, the U.S. shed further light on the discussion held at the Fairness Hearing regarding whether reaching a settlement with the assistance of a mediator triggers a presumption of fairness. The Court has considered this briefing and grants the motion to supplement.

17

### c.  The Plaintiffs' Motion for Final Approval of the Settlement

The Court now turns to the Rule 23(e) fairness analysis, taking each factor in turn. For the reasons that follow, the Court finds that the Settlement is both procedurally and substantively fair.

### i.     Fairness Analysis: Is the Settlement Procedurally Fair?

In order to grant approval of a settlement, Rule 23(e)(2) requires district courts to find that it is procedurally fair. To make this finding, the Court must conclude that class counsel and the Class Representatives have adequately represented the class. In making this determination with regard to the Class Representatives, the Court is to consider whether their interests are antagonistic to that of the other potential class members. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (stating the adequacy requirement for class representatives). Here, the Class Representatives have the same interests and similar injuries to those of the other eligible class members. They are all purchasers of canisters of ADEG from the recalled lots which were misleadingly labeled, possibly resulting in gastrointestinal distress. The Class Representatives all actively participated in discovery and were deposed, as well. *See* Final Approval Decl. ¶ 25.

In assessing whether class counsel have adequately represented the class, Courts should consider whether plaintiffs' attorneys are qualified, experienced and

able to conduct the litigation. *See In re Barrick*, 314 F.R.D. at 99 (stating the adequacy requirement for class counsel). Class counsel in this case, Weitz & Luxenberg, P.C. ("Weitz"), is clearly qualified to represent the eligible class members. Weitz is a law firm that has represented classes in similar actions for more than 35 years, and Weitz's lead attorney for this case has close to 15 years of relevant experience. *See* Preliminary Approval Decl. ¶¶ 42-43; Final Approval Decl. ¶ 19.

Class counsel represents that they have been working on this case for more than four years, actively pursuing litigation, engaging in discovery, filing several motions, participating in mediation, and ultimately achieving a settlement agreement that some counsel involved in the case believed was unlikely. *See* Decl. of Joseph DiBenedetto ¶ 6. Class counsel represent that they expended 1,813.65 hours litigating and settling this case as of May 17, 2022, just prior to the Fairness Hearing. *See* Final Approval Decl. ¶ 18. Because of the time and diligence with which the class counsel and Class Representatives prosecuted this case, the Court finds that they have adequately represented the class.

The Court also finds that the Settlement satisfies the Rule 23(e)(2)(B) requirement to negotiate a settlement at arm's length. The Settlement was achieved with the help of a mediator, Joseph DiBenedetto ("DiBenedetto"), who has served on the Panel of Neutrals for this Court since 2016 and has conducted more than

700 mediations. *See* DiBenedetto Decl. ¶ 2. Prior to that, DiBenedetto had a career as a litigator spanning nearly 50 years. *See id*. Because the Settlement was achieved with the assistance of a skilled mediator after depositions were taken and discovery was conducted, the Court finds that the presumption of procedural fairness applies. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (explaining that a presumption of fairness may attach to a settlement reached by arm's length negotiation after discovery is conducted). Because of the time expended by the parties, the parties' counsel, and the mediator, as well as the lack of any allegations of collusion,[3] the Court finds that the Settlement Agreement was satisfactorily negotiated at arm's length. In sum, the Settlement is procedurally fair.

  ii. *Fairness Analysis: Is the Settlement Substantively Fair?*

  The Court now addresses the more challenging assessment of the substantive fairness of the Settlement, and the one implicated by the U.S.'s objection: Rule 23(e)(2)(C)'s requirement for adequate class relief.

  It is Plaintiffs' position that the total value of the Settlement is $3,613,970. This valuation includes a $1,888,970 valuation of the Settlement coupons, which assumes 100% distribution and redemption. However, as of the Fairness Hearing,

---

[3] The U.S. does not object to the procedural fairness of the Settlement and acknowledges that the use of the mediator lends a presumption of procedural fairness.

only approximately 2.2% of eligible class members opted to be compensated with coupons. [4] This means that the remaining 97.8% of the "value" of the coupon portion of the settlement will provide no benefit to the class and impose no burden on Defendants. Indeed, the value of that portion of the settlement will be even less because common sense dictates that only a fraction—perhaps a very small fraction—of the coupons issued will be redeemed. Even those claimants who do redeem their coupons will have to incur an additional out-of-pocket expense to purchase products from Defendants, who will actually *benefit* from the increased business.

Still, courts in this Circuit approve coupon settlements provided that they contain the appropriate safeguards. *See, e.g., Berkson v. Gogo LLC*, 147 F. Supp. 3d 123, 132-33 (approving a coupon settlement that adhered to the strictures of CAFA and when class counsel successfully showed by convincing evidence that the coupons had real benefit to class members, many of whom were sophisticated, repeat customers of defendants). Here, the Court finds that the parties have adequately accounted for the potential pitfalls of a coupon settlement. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) ("The potential for abuse is greatest when the coupons have value only if a class member

---

[4] This figure represents the approximate total number of potential class members, 188,897, divided by 4,237, the number of claimants that Plaintiffs represent will be awarded coupons.

is willing to do business again with the defendant . . . , when the coupons have

modest value compared to the new purchase for which they must be used, and

when the coupons expire soon, are not transferable, and/or cannot be aggregated.").

The Settlement includes a fund for cash payouts that class members may opt

into as an alternative to coupons. Thus, any coupon holder will have either opted to

receive a coupon instead of a cash payment or failed to make a selection. Also, the

coupon holders will have three years to redeem them, which is adequate time to put

the coupons to use if the holders so choose.

Here, the best possible recovery would have been a one-hundred percent

refund for all class members. However, "even a fraction of the potential recovery

does not render a proposed settlement inadequate." *In re Initial Public Offering

Secs. Litig.*, 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009). The financial value of

the Settlement to class members must be viewed in the context of all of the

*Grinnell* factors, including the complexity, expense and likely duration of

litigation, the risks of establishing liability and damages, the risks of maintaining

the class through trial, the amount of discovery completed, and the ability of

Defendants to pay a larger judgment. *See City of Detroit v. Grinnell Corp.*, 495 F.

2d 448, 463 (2d Cir. 1974).

There is no guarantee that Plaintiffs would have prevailed at trial or won a

full refund for the class. Plaintiffs' motion for class certification was pending with

the Court at the time that the parties finalized the Settlement Agreement, and there was no certainty that the Court would have certified some or all of the proposed classes. Also, the outcome of a case brought to trial is notoriously uncertain. This uncertainty favors approval of the Settlement. *See, e.g., Guippone v. BH S&B Holdings LLC*, No. 09 Civ. 01029 (CM) 2016 WL 5811888, at *7 (S.D.N.Y. Sept 23, 2016) ("[I]f 'settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome' . . . Given that the settlement alleviates the uncertainty surrounding the litigation, these factors weigh in favor of final approval." (quoting *Asare v. Change Grp. of New York, Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *11 (S.D.N.Y. Nov. 18, 2013))).

The late stage of litigation during which the parties participated in mediation meant that they were well-informed and efficiently positioned to reach a settlement that accurately reflected the risks of proceeding with the case through trial and the realities of the strength of each party's position. *See In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281-82 (S.D.N.Y. 1999) (holding that having reached a settlement after discovery, investigation, and analyses weighed strongly toward approval of the settlement). The parties had undertaken more than three years of motions practice and had completed discovery. It is likely that proceeding further with litigation would have been lengthy and costly, potentially to the detriment of the class's recovery.

In addition, Defendants' ability to withstand a greater judgment was questionable. NaturMed was bought by IVL, ostensibly as a result of economic distress the company faced following the 2016 recall of ADEG. Therefore, even if Plaintiffs received a greater judgment against Defendants at trial, payment was not guaranteed.

In its Statement of Interest, the U.S. notes that the reaction of the eligible class members was not overwhelmingly positive. Although there was only one opt-out and one individual who objected, and that objection was not to the fairness of the Settlement, only approximately 5.5 percent of eligible class members opted into the Settlement. The relatively small number of eligible class members who opted in points toward a tepidness from the class toward the Settlement. *See, e.g., Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 49 (D. Me. 2005) ("[I]n considering the 'reaction of the class,' the Court also considers the relatively small percentage of class members (19.7 percent) who have expressed implicit support for the proposed settlement by returning claim forms as well as the vast majority that have remained silent and essentially expressed a reaction of utter indifference to the settlement.").

Of course, the Court has concerns about coupon settlements in light of their potential for abuse and the uncertain benefit they pose to the class. However, Congress did not entirely outlaw coupon settlements. Instead, it provided courts

24

with the appropriate guardrails to ensure that the settlements are not abusive and achieve benefits for class members.

It is also important to consider that class settlements contain potential social utility, or the so-called tenth *Grinnell* factor:

> It is proper to consider as *a tenth factor the social utility of the proposed settlement*. Meeting the tenth requirement of social utility may entail going beyond the four-corners of the complaint, considering issues related to the specific claims alleged, and evaluating how the proposed settlement will impact those issues and persons not in the class.

*Berkson*,147 F. Supp. 3d at 131 (emphasis in original).

In this case, one potential social utility would be the removal of the contaminated product from the market, which Defendants already achieved with their recall. Presumably, the class settlement will incentivize Defendants to be more vigilant about the safety and cleanliness of their product in the future, and others in their industry will be encouraged to do the same. Although the market may view the $100,000 cash payout to class members as relatively low, the total cash payment to the Settlement Fund of $1.725 million, as well as the additional cost to Defendants of this litigation, serves a deterrent purpose. As a result, Defendants and others in their industry ostensibly will be encouraged to closely adhere to the safety regulations they are required to follow as manufacturers and distributors of ingestible goods. Therefore, social utility is achieved with the Settlement and the so-called tenth *Grinnell* factor weighs in favor of approval.

25

The Court believes that the class members are sufficiently protected from the potential dangers that can befall coupon settlements. When weighing all of the *Grinnell* factors, as well as the social utility of the Settlement, the balance tips toward a finding of substance fairness. Once again, "[i]n finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 456 (S.D.N.Y.2004) (quoting *Thompson v. Metro. Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y.2003)). In addition, there is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re PaineWebber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir.1998).

"Settlement approval is within the Court's discretion, which should be exercised in light of the general judicial policy favoring settlement." *In re Sumitomo*, 189 F.R.D. at 280 (internal quotations omitted). The Court has carefully examined the Settlement and finds that final approval is appropriate. Accordingly, the motion for final approval is granted.

iii.    *Does the Settlement Unfairly Compensate Class Representatives?*

Now, the Court turns to an assessment of the proposed service awards to the named Plaintiffs under the *Roberts* analysis, and the second facet of the Settlement to which the U.S. objects. *See Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200

(S.D.N.Y. 1997) (holding that courts should consider "the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise)" in determining if service awards are appropriate).

Service awards for class representatives are common in class actions in the Second Circuit. *See*, *e.g.*, *Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101 (E.D.N.Y. 2015) (holding that service awards for named plaintiffs who had participated in discovery were appropriate). Courts in this Circuit have approved service awards of up to $100,000 each and courts routinely approve settlements containing service awards of $5,000 or more per class representative. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp., No*. 14-CV-7126, 2018 WL 6250657, at *4 (S.D.N.Y. Nov. 29, 2018) (approving a service benefit award that included $50,000 and $100,000 awards to named plaintiffs); *see also Chapman v. Tristar Prods., Inc.*, Nos. 16-CV-1114, 17-CV-2298, 2018 WL 3752228, at *10-11 (N.D. Ohio Aug. 3, 2018) (approving service awards of $7,500 and $6,000 to representatives of consumer class action that led to a coupon settlement); *see also Massiah v. MetroPlus Health Plan, Inc.*, 11 CV 5669 (BMC), 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012) (collecting cases in the Second Circuit approving service awards ranging from $5,000 to $30,000).

Nonetheless, the U.S. objects to the proposed awards of $5,000 as disproportionate to the proposed benefits to be awarded to the other eligible class members. The U.S. also notes that the Class Representatives do not appear to have risked any harm in representing the class, nor lent any special expertise to the action.

While there is no assertion that the Class Representatives risked any particular harm, they expended time and effort to participate in the litigation for the past four years, and particularly during the approximately three years of active discovery. They sat for depositions, responded to interrogatories, and provided electronic discovery. Given the effort expended and length of time during which the Class Representatives participated in the litigation, the Court finds that the proposed service awards are appropriate.

  iv. *Is the Settlement's Award of Attorneys' Fees Reasonable?*

As noted, approval of a class action settlement requires an assessment of "any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Generally speaking, courts use one of two methods to make this assessment. They either calculate a "lodestar" by multiplying a reasonable hourly rate by the number of hours reasonably spent on the case, or they award an appropriate percentage of the recovery to class counsel. In most circuits, including the Second Circuit, "district courts enjoy the discretion to use either the lodestar or the percentage

method." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 49 (2d Cir. 2000) (citing cases).

As part of its heightened scrutiny of coupon settlements, CAFA imposes special considerations on fee awards in such cases. Thus, "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). "If . . . a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action." *Id.* § 1712(b). If the settlement includes coupons and equitable relief, "that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a)," while "that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b)." *Id.* § 1712(c).

The import of § 1712 is difficult to discern. *See Galloway v. Kan. City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016) (describing § 1712 as "badly drafted"). Significantly, subsection (c) appears to authorize a hybrid lodestar and percentage method for "mixed" settlements involving coupons and equitable relief. That subsection does not apply in this case, however, because the Settlement does

not include any equitable relief. The statute is frustratingly silent as to what a district court can and should do when faced with other types of "mixed" settlements that include both cash and coupon components, as here.

Most circuits have concluded that, whatever § 1712's purpose may be, it does not impinge upon a district court's discretion to choose between the lodestar method and the percentage method of calculating attorneys' fees in a class action. *See Galloway*, 833 F.3d at 974-75; *Linneman v. VitaMix Corp.*, 970 F.3d 621, 627 (6th Cir. 2020); *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706-07 (7th Cir. 2015). The Ninth Circuit arguably reached a contrary conclusion in *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013), which held that "[w]hen a settlement provides for coupon relief, either in whole or in part, any attorney's fee 'that is attributable to the award of coupons' must be calculated using the redemption value of the coupons." *Id.* at 1175-76 (quoting 28 U.S.C. § 1712(a)). Subsequent cases from that court clarify, however, that "a district court may still award fees based solely on a lodestar methodology if (1) 'it does so without reference to the dollar value of [the coupon relief]' or (2) 'if it accounts for the redemption rate of the coupons in calculating the dollar value.'" *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 664-65 (9th Cir. 2020) (quoting, with alteration, *In re Easysaver Rewards Litig.*, 906 F.3d 747, 759 (9th Cir. 2018)).

The Second Circuit has not opined on the issue in a published opinion. However, it offered some insight in *Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1 (2d Cir. 2012). There, objectors to a class settlement argued that part of the recovery was tantamount to a coupon and, therefore, subject to § 1712. The Second Circuit avoided that issue by holding that the district court's lodestar award would not violate the statute in any event because "no portion of the attorney's fee award is attributable to the award of the coupons." *Id.* at 4 (internal quotation marks and alterations omitted).

Though not binding, the Second Circuit's holding in *Blessing* is consistent with the reasoning of the cases cited above and, in particular, with the holding in *Chambers* that a district court may apply the lodestar method to a "mixed" settlement if it can do so "without reference to the dollar value" of the coupons. 980 F.3d at 664. In addition, it is consistent with the longstanding recognition that a district court is in the best position to determine the appropriate method of calculation. *See Goldberger*, 209 F.3d at 50 (questioning "the wisdom of abandoning the lodestar entirely" when "the reasonableness of the claimed lodestar can be tested by the [district] court's familiarity with the case").

For these reasons, the Court concludes that it retains the discretion to choose between the lodestar and percentage method in this case. Under the latter method, § 1712 would require the Court to calculate the value of the Settlement based on

31

redeemed coupons, a figure that is currently unknown but at most $42,370. Moreover, courts using the percentage method usually select percentages in the range of 25-30%. Not including the service benefit awards, the resulting fee under this calculation method would be no greater than $42,711 (30% of $142,370). In the Court's opinion, such a fee would be unreasonably low given the tangible benefit to the class and the intangible benefit to the public of holding defendants accountable for selling defective products. Thus, the Court opts for the lodestar method.

Both the hours spent litigating this case and class counsel's proposed hourly rate are reasonable. But "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley*, 461 U.S. at 434 (1983). Whether calculated by the lodestar or the percentage method, the fee must ultimately be "reasonable." *Goldberger*, 209 F.3d at 48. While the basic lodestar calculation presumptively yields a reasonable fee, *see Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1987), a district court must still decide whether to increase or decrease the result based on "less objective factors." *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (internal quotation marks omitted).

One notable "less objective factor" is "the requested fee in relation to the settlement." *Goldberger*, 209 F.3d at 50. This factor is equivalent to considering the "results obtained" in determining fees under a fee-shifting statute; the Supreme

Court has described this as "important" and "particularly crucial" when the plaintiff is only partially successful. *Hensley*, 461 U.S. at 434.

The relationship between the requested fee and the proposed settlement takes on even greater importance in coupon cases because it reflects the same concern with class counsel reaping a windfall when the benefit to the class is modest (or, at worst, illusory). Even the cases approving the use of the lodestar method in such circumstances contemplate reductions to the basic calculation based on the degree of success. *See Galloway*, 833 F.3d at 975 ("Our review of the record persuades us that any award greater than $17,438.45 would be unreasonable in light of class counsel's limited success in obtaining value for the class."); *Linneman* 970 F.3d at 628 ("[A] district court will often abuse its discretion if it fails to consider the redemption rate as part of th[e lodestar] analysis."); *In re Sw. Airlines*, 799 F.3d at 710 ("[w]hen a district court considers using the lodestar method in this manner, it will need to bear in mind the potential for abuse posed by coupon settlements and should evaluate critically the claims of success on behalf of a class receiving coupons"). Similarly, in affirming the district court's lodestar calculator in *Blessing*, the Second Circuit noted that "the district court independently inspected applicable time and expense records before judging the reasonableness of the requested fee, which—after accounting for expenses— represented less than sixty percent of the lodestar calculation." 507 F. App'x at 4.

In other words, the decision to use the lodestar method does not obviate the need to examine the coupon portion of a settlement. Rather, a district court should still consider coupons in assessing the "results obtained" for the class.

Here, class counsel has requested a fee award of $992,421 and costs of $202,236.34. They determine their fees based upon a downward departure of approximately 5.6 percent from their lodestar, which they calculate to be $1,050,940. At the Fairness Hearing, class counsel represented to the Court that this downward departure was made "in an attempt to be reasonable." Fairness Hearing Tr. at 19. The costs requested are also lower than the maximum of $210,136.30 allowed by the Settlement.

In the Settlement Agreement, the parties agreed that class counsel would not request a fee award greater than one-third of the total value of the Settlement, which they calculate to be $1,207,019. This figure represents one-third of the value of the Settlement Fund plus the total value of all available coupons, not the coupons redeemed at the end of the three-year period. Under CAFA, this is inappropriate. *See* 28 U.S.C. § 1712(a)-(c). However, in the motion for final approval, class counsel remedied their error by requesting a fee calculated based on the lodestar.

Still, the Court must consider the reasonableness of the proposed award. The U.S. objects to the attorneys' fee award as outsized when compared with the value of the Settlement's benefit to individual class members. The Court agrees.[5]

As explained above, the outcome of this case was uncertain, and class counsel were able to successfully obtain a settlement for the class that ultimately is fair and reasonable. Nor does the Court question that class counsel provided quality representation to the class.

However, the value of the benefits to be awarded to the class members compared with the handsome fee award reveals an imbalance that cannot be justified as proposed. The proposed fee award of $992,421 is almost 60% of the total Settlement Fund and almost ten times the $100,000 to be distributed to the class members in cash. Class counsel argue that the value of the coupons should be included in the calculation, but proposes a value of $1,888,970, which represents the total value of all available coupons *if redeemed*. For the reasons stated, it would be improper for the Court to assume that all coupons will be (i) claimed and (ii) redeemed. The correct valuation requires the Court to determine a redemption rate and class counsel have failed to provide the Court with any evidence on which to base such a determination.

---

[5] The U.S. does not specifically object to the proposed costs and administrative fees for the Settlement.

The U.S. proposes that the Court should delay any attorneys' fee award approval until after the three-year redemption period, at which time the Court would have the most accurate information regarding the Settlement's total value. Class counsel contest that waiting three years for payment is unfair. The Court also recognizes that waiting three years to reconsider the proposed award may result in a host of logistical challenges for the parties. To combat these potential challenges, CAFA contemplates an alternative to waiting until the coupon redemption period has expired. Under 28 U.S.C. § 1712(d), class counsel may submit "expert testimony from a witness qualified to provide information on the actual value to the class members of coupons that are redeemed" to allow the Court to make an accurate determination of the Settlement value, and in turn the reasonableness of fees. However, no party has moved for such evidence to be considered and it may be that the size of the settlement does not warrant the extra expense that expert testimony entails.

In sum, the Court must assume a redemption rate of 0% and, therefore, assign no value to the coupon portion of the settlement. The resulting disparity in the amount sought by class counsel ($992,421) and the amount obtained by the class ($100,000)[6] requires a reduction of the lodestar.

---

[6] This figure does not include the $70,000 set aside for service benefit awards.

The Court must next decide the reduction it will apply. Any amount will be, to some extent, arbitrary, and there are few limits to guide the Court's discretion. The Court therefore relies on the general principle guiding attorneys' fees in class actions: "[T]he attorneys whose efforts created [a common] fund are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger*, 209 F.3d at 47. As explained above, the Fund in this case is fair, in part because it represents a mutually acceptable compromise between parties with adverse interests.

Once the size of the fund is established, however, incentives change. Defendants have an interest in keeping the fund small but are theoretically indifferent as to how it is apportioned. Coupon settlements are cause for concern because they allow class counsel to claim a disproportionately large share of a smaller total fund. Thus exists the need for heightened judicial scrutiny to protect the interest of the class.

One solution is to redistribute the Fund to increase the proportion awarded to class members and decrease the proportion awarded to class counsel. By its very nature, a settlement fund provides less than complete relief, but the circumstances of this case allow the Court to move towards that goal.

The Settlement was negotiated based on an estimated class size of 188,897. It allowed each class member to choose between a coupon and cash, with

defendants agreeing to provide a $10 coupon to each coupon recipient in the class, but only $100,000 pro rata among the class members opting for cash. Had every class member chosen cash, each would have received less than 53 cents ($100,000/188,897). The Settlement, as contemplated, was a textbook example of why coupon settlements are looked upon with suspicion.

As it happened, however, only 10,373 class members made a claim, with 6,136 taking the cash option. Consequently, each of those class members is projected to receive $15.85. The result is sufficient to satisfy the Court of the Settlement's overall fairness, but it still means that class counsel would receive approximately ten times more than the class.

Recall that one canister of ADEG costs $39.95. A full refund to each of the class members claiming cash would total $245,133.20 ($39.95 x 6,136). The Settlement Fund is not sufficient to provide that relief as currently structured but would be if class counsel's fee was reduced by $145,333.20. The result would be a more palatable split of approximately 75% to class counsel and 25% to the class.[7]

In sum, a $145,333.20 increase in the cash available to class members will provide something approaching complete relief to a significant portion of the class

---

[7] This proportion would still be unreasonably high under a strict percentage-of-the-fund method, but the Court is not using that method. Rather, it has considered the relative shares of the Settlement Fund as a reason to reduce an otherwise unobjectionable lodestar.

members who have made a claim and, at the same time, partially rectify an

unacceptable disparity in the share of the Fund going to attorneys' fees.[8]

## CONCLUSION

The Plaintiff's motion to strike is **DENIED** and the U.S.'s motion to

supplement is **GRANTED**. The Plaintiffs' motion for class certification for the

purposes of settlement and for final approval of the class settlement is

**GRANTED**. The Plaintiffs' motion for approval of the proposed award of

attorneys' fees is **DENIED** without prejudice to renewal on the terms set forth in

this memorandum and order.

**SO ORDERED.**

_/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 13, 2023

---

[8] The Court has also considered increasing the cash available to provide a full refund to *all* 10,373 claimants. That would require class counsel to reduce their fee by $314,401.35. The Court finds such a reduction excessive for the same reasons it chose not to evaluate attorneys' fees under the percentage method.